David O. BARROWS, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CM–740.

District of Columbia Court of Appeals.

Argued Oct. 6, 2010.

Decided Feb. 24, 2011.

Jeffrey L. Light, Washington, DC, appointed by the court, for appellant.

Kristina L. Ament, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Roy W. McLeese III and Mary B. McCord, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, KRAMER, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

A jury convicted appellant David Barrows of engaging in disorderly and disruptive conduct on United States Capitol grounds, in violation of D.C.Code § 10–503.16(b)(4) (2001).[1] The government's evidence was that, on September 11, 2007, appellant entered a Senate Foreign Relations Committee hearing in the Hart Senate Office Building and, during the testimony of General David Petraeus, shouted, "You are trying to set a trap for us to bomb the helpless people of Iran. Aren't 750,000 deaths enough for your blood thirst?"

Appellant raises four issues on appeal, all of which relate to the trial court's conduct of the jury-selection process. Specifically, appellant contends that he was deprived of an impartial jury and a fair and public trial because the court (1) closed the courtroom to the public during *voir dire*; (2) improperly struck two prospective jurors for cause; (3) did not adequately probe the prospective jurors with questions regarding appellant's political views; and (4) improperly allowed the prosecutor to ask prospective jurors about whether they or any of their close relatives were injured during the September 11, 2001 terrorist attacks. We find no reversible error.

## I.

■■■ After the court and the parties had discussed the government's proposed *voir dire* questions and before members of the jury venire entered the courtroom, the trial judge announced, "I'm going to ask everybody in the courtroom, just for voir dire, to please leave the courtroom, because I'm going to have to fill up the chairs in the back, okay. Is that okay with everybody? Not okay?" The trial judge then directed his attention to one spectator and said, "Okay. Ma'am, do you understand why you have to leave?" That unidentified spectator answered, "Yes. Thank you." The judge then explained to another spectator why he wanted to close the courtroom during *voir dire:* "Well ma'am, it's kind of hard for you to stay while we do this because I don't want to get confused as to who you are and who the jurors are. But after voir dire is over, you all—when the trial starts, you all are welcome to come in. Okay? It's [a]n open court, okay. All right."

Appellant contends that he is entitled to reversal of his conviction because the closure of the courtroom to spectators during *voir dire* violated his Sixth Amendment right to a public trial. He made no contemporaneous objection to closure of the courtroom, however, instead raising the issue for the first time in this appeal. The government therefore argues that appellant has waived the issue[2] or that his claim

1. Section 10–503.16(b)(4) prohibits:

 utter[ing] loud, threatening, or abusive language, or ... engag[ing] in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

2. The government cites, *inter alia, Levine v. United States*, 362 U.S. 610, 619–20, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (concluding, in a case in which the petitioner had failed to object to a closed courtroom during a criminal contempt proceeding, that "[d]ue regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal"); *United States v. Hitt*, 473 F.3d 146, 155 (5th

for relief is subject to plain error-review.[3] Appellant, of course, disagrees, and asserts that the record "suggests that the second unidentified woman objected to being removed," a putative objection that appellant argues sufficed to preserve the issue for appellate review. He relies on *Williams v. United States*, 966 A.2d 844, 847 (D.C. 2009) (holding that, in limited circumstances, a co-defendant's objection may suffice to preserve an issue on appeal for an appellant who did not himself lodge the objection in the trial court).

Appellant concedes that the transcript of what transpired as the court was about to conduct *voir dire* contains no actual spectator objection, but he asks us to surmise from the trial judge's remarks ("Not okay? ... Well, ma'am, it's kind of hard for you to stay while we do this ....") that an unidentified woman spectator objected to being removed from the courtroom. Even assuming that there was such a spectator objection (rather than, for example, a facial expression or gesture of displeasure) and that the rationale of *Williams* may be extended to cover spectator objections (an issue we need not and do not decide), we are not persuaded that the trial judge was alerted to the issue that appellant has raised on appeal. The (putative) spectator objection may not have been a rights-based or other legal objection (but instead, for example, an expression of displeasure at the spectator's having to expend energy to rouse herself and move out of the courtroom). We are unwilling to assume that the putative objection alerted the trial court to the legal error of which appellant now complains.[4]

At the same time, mindful that appellant proceeded *pro se* in the trial court (albeit with the assistance of two attorney-advisors), this is not a case in which the "circumstances suggest[ ] that the lack of objection might have been strategic, rather than inadvertent," such that "overlooking the lack of objection simply encourages defense gamesmanship." *Robinson*, 976 A.2d at 1080. We proceed therefore to review appellant's claim under the strictures of the plain-error standard. Under that standard of review, to obtain relief, appellant must show not only (1) that the trial court erred in excluding spectators from *voir dire*, but also (2) that the error "should have been 'clear' or 'obvious' to the [trial] court," (3) "affected his 'substantial rights,'" and (4) "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *Zanders v.*

---

Cir.2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial."); *Robinson v. State*, 410 Md. 91, 976 A.2d 1072, 1082 (2009) ("The right to a public trial, though fundamental, is not within the narrow band of rights that courts have traditionally required an individual knowingly and intelligently [to] relinquish or abandon in order to waive the right or claim.") (citation and internal quotation marks omitted).

**3.** *See, e.g., United States v. Bucci*, 525 F.3d 116, 129 (1st Cir.2008) (applying plain-error analysis to claim that trial court committed structural error by closing the courtroom).

**4.** Further, even if the supposed spectator objection was a legal objection, it might have been premised on the spectator's First Amendment right to attend *voir dire*, rather than on appellant's Sixth Amendment right to a public proceeding. Thus, even if the trial judge had been alerted to consider the First Amendment implications of the announced courtroom closure, he would not necessarily have been apprised of the need to consider the scope of appellant's Sixth Amendment right to a public trial. *See Presley v. Georgia*, —— U.S. ——, 130 S.Ct. 721, 724, 175 L.Ed.2d 675 (2010) (per curiam) (explaining that "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive is an open question" and that "the reach or protections of one [amendment] might be greater than the other").

*United States,* 999 A.2d 149, 158 (D.C. 2010) (quoting *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (further citation omitted)). We have discretion to correct the error only if each of these four prongs is satisfied. *Olano,* 507 U.S. at 737, 113 S.Ct. 1770.

■ In light of the Supreme Court's 2010 opinion in *Presley,* the government concedes that the court's closure of the courtroom during *voir dire* was error. *See* 130 S.Ct. at 724 ("[T]he Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors"). The government also acknowledges that the error was structural [5] and that, under this court's jurisprudence, we must assume that it affected appellant's "substantial rights." *See Arthur v. United States,* 986 A.2d 398, 413 (D.C.2009) ("[I]f [the error] is structural in nature, the defendant's substantial rights will be deemed to have been affected, without need for further analysis in the context of the particular trial.") (citation omitted).[6] The government contends, however, that the error was not "plain" at the time of appellant's 2007 trial and that appellant also has not met his burden with respect to the fourth prong of the plain-error test.

To support its argument that the error was not plain at the time of trial, the government points to the statement by the dissenting justices in *Presley* that the Court had not previously decided that *"voir dire* is part of the 'public trial' that the Sixth Amendment guarantees." 130 S.Ct. at 726 (Thomas, J., dissenting). In holding that the Sixth Amendment right to a public trial extends to *voir dire,* the *Presley* majority relied on the Court's holdings in two prior cases, *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (holding that the public-trial right extends to pretrial suppression hearings), and *Press–Enterprise Co. v. Superior Court of Cal., Riverside Cnty.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (holding that the press and the public have a First Amendment right to attend *voir dire* ). *See Presley,* 130 S.Ct. at 723–24. The government relies on the statement in the *Presley* dissent that neither *Waller* nor *Press–Enterprise* "govern[ed] squarely and directly" the issue of whether the accused's Sixth Amendment public-trial right extends to *voir dire. Id.* at 726 (Thomas, J., dissenting) (noting, at 727, that petitioner Presley "did not seek summary reversal based on ... well-established precedents ..., but instead asked [the Court] to 'resolve [a] split of authority' "). The government also cites a number of federal court decisions reflecting that, prior to *Presley,* jurisprudence about whether the Sixth Amendment public-trial right extends to *voir dire* was less than well-settled.[7]

5. *See Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (listing "denial of public trial" as among the very limited class of "structural" errors, and explaining that a "structural error" is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.") (citation omitted).

6. We note that the Supreme Court "has several times declined to resolve whether 'structural' errors—those that affect 'the framework within which the trial proceeds' ... automatically satisfy the third prong of the plain-error test." *Puckett v. United States,* — U.S. —,

129 S.Ct. 1423, 1432, 173 L.Ed.2d 266 (2009) (internal citation omitted).

7. *See, e.g., Woodson v. Hutchinson,* 52 Fed. Appx. 195, 198 (4th Cir.2002) (per curiam) (noting that "it is not certain that the Public Trial Clause [of the Sixth Amendment] applies to voir dire proceedings"); *Patton v. United States,* No. CR 2–93, 2010 WL 3191887, at 2–3, 2010 U.S. Dist. LEXIS 80913, at *7, *10 (W.D.Pa. Aug. 11, 2010) ("[A]t the time of the subject proceeding [November 8, 2004], it was arguably unsettled whether the Sixth Amendment public trial right attached to voir

However, the *Presley* majority used strong language, declaring that under the Court's "clear precedents," it was "so well settled that the Sixth Amendment right extends to jury *voir dire* that this Court may proceed by summary disposition." 130 S.Ct. at 722–24. This court, too, has previously taken as a given that the Sixth Amendment right to a public trial "applies to the entire trial, including that portion devoted to jury selection." *Kleinbart v. United States,* 388 A.2d 878, 881 n. 4 (D.C. 1978). We must agree, therefore, that the error in excluding members of the public from the courtroom during *voir dire* (without a compelling reason and consideration of alternatives, as described in *Waller*[8]) was an obvious, and thus "plain," error at the time of appellant's trial.

■ The question that remains is whether appellant has met his burden under plain-error review to show that the error in excluding spectators from the courtroom during *voir dire* "seriously affected the fairness, integrity or public reputation of the judicial proceedings." A number of federal appellate courts have reasoned that because a structural error (such as denial of the right to a public trial) "necessarily render[s] a trial fundamentally unfair," *Neder,* 527 U.S. at 8, 119 S.Ct. 1827, it is "difficult to imagine a case where structural error will not satisfy *Olano's* fourth requirement" of an error that "seriously affects the fairness ... of judicial proceedings." *United States v. Jimenez Recio,* 371 F.3d 1093, 1103 n. 7 (9th Cir.2004).[9] One judicial opinion observed a dozen years after *Olano* that "[s]o far as can be discovered, no court has ever actually held that an error is structural but fails to meet the fourth prong of the plain error test." *United States v. Rodriguez,* 406 F.3d 1261, 1266 (11th Cir.2005) (Carnes, J., concurring). But neither the Supreme Court nor this court has squarely addressed the question of whether an error that is structural will, invariably, satisfy the fourth prong of the plain-error test. Thus, we are confronted with an issue of first impression.

■ In deciding the issue here, we begin by recognizing that any error that is "structural" is likely to have an effect on the fairness, integrity or public reputation of judicial proceedings.[10] We cannot, how-

dire."); *cf. Edelkind v. United States,* No. 05–cr–60067, 2010 WL 2944369, at *7–8, 2010 U.S. Dist. LEXIS 73824, at *23–*24 (W.D. La. June 28, 2010) (rejecting defendant's ineffective-assistance claim, which was based on appellate counsel's failure to raise as an issue the trial court's exclusion of the public during *voir dire,* because *Presley* "was decided long after [defendant] was tried" and "[w]hether the performance of counsel was deficient is based upon the law as it existed at the time of trial").

8. *See* 467 U.S. at 48, 104 S.Ct. 2210 ("[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must

make findings adequate to support the closure").

9. *See also United States v. Stewart,* 306 F.3d 295, 322 (6th Cir.2002) (finding it "difficult to imagine" that an error meeting the other prongs of the test will not also be deemed to "seriously affect the fairness, integrity, or public reputation of judicial proceedings"); *State v. Russell,* 159 N.H. 475, 986 A.2d 515, 530 (2009) (recognizing that "[t]here is some authority that supports the conclusion that structural errors satisfy the third and fourth prongs of the plain error rule").

10. This recognition reflects the fact that, when an error under review is structural in nature, we will consider the impact on not only the particular proceeding but also the broader interest that the right that has been violated is intended to protect.

ever, lose sight of the Supreme Court's instruction in *Olano* that, in applying the fourth prong of the plain-error standard, courts must consider whether an error "seriously" affected those factors. 507 U.S. at 732, 113 S.Ct. 1770. Although *Olano* did not involve structural error, we take it from that general instruction that a conclusion that an error had some slight impact on the fourth-prong factors is not enough for a court to conclude that the fourth prong is satisfied. We also take heed of the Supreme Court's recent admonition that the fourth prong test "is meant to be applied on a case-specific and fact-intensive basis," and that a "per se approach to plain-error review is flawed." *Puckett*, 129 S.Ct. at 1433 (citation and internal quotation marks omitted).[11] *Puckett* also was not a case involving structural error, but its admonition about applying the fourth-prong analysis of an error's effect on the fairness of a criminal proceeding on a "case-specific and fact-intensive basis" was consistent with the

Court's observation a few years earlier that, even in preserved-error cases, "[i]t is only for *certain* structural errors undermining the fairness of a criminal proceeding as a whole" that the error "requires reversal without regard to the mistake's effect on the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (italics added).

Considering the specific facts of this case, we are not persuaded that the brief closure of the courtroom during *voir dire* seriously affected the factors that concern us in applying the fourth-prong test.[12] To begin with, the trial judge offered a neutral (though insufficiently compelling) reason for closing the courtroom to spectators and assured spectators they would be "welcome to come in" for trial and that "[i]t's [a]n open court." We cannot conclude that the judge's (polite) handling of the matter, though erroneous, had any serious adverse effect on the public reputation of the court. Further, nothing in the rec-

---

**11.** The Court has also made clear that "plain error review applies to all direct appeals from federal convictions, even as to structural errors." *United States v. Brandao*, 539 F.3d 44, 57 (1st Cir.2008) (citing *Johnson v. United States*, 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). In a number of decisions, courts have found or assumed structural error on plain-error review, but nonetheless concluded that the fourth-prong test was not met. *See, e.g., Rahn v. Hawkins*, 464 F.3d 813, 819–20 (8th Cir.2006) (finding structural error in the trial court's having denied the defendant his right to exercise a third peremptory strike, but concluding that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings since "[t]he error disadvantaged both sides equally, and there is no evidence that the jury finally seated was anything less than completely fair"); *United States v. Pryor*, 195 Fed.Appx. 65, 71 (3d Cir.2006) (finding that the trial court's "failure to instruct the jury on the element of intent ... may or may not" have amounted to a structural error, but concluding that the error did "not meet the final

requirement of plain error analysis"); *United States v. Sassanelli*, 118 F.3d 495, 499–500 (6th Cir.1997) (assuming without deciding that an improper jury instruction was a structural error, but concluding that the " 'fairness, integrity, or public reputation of judicial proceedings' were [sic] not compromised by the district court's error"); *United States v. Gonzalez*, 110 F.3d 936, 947 (2d Cir.1997) (explaining that there is "no *per se* rule that structural error affecting substantial rights must be noticed as plain error") (citing *United States v. David*, 83 F.3d 638, 647 (4th Cir. 1996)).

**12.** *Voir dire* began around 2:00 p.m. and concluded before court recessed for the day. Compare the length of the *voir dire* in *Press–Enterprise*, 464 U.S. at 510, 104 S.Ct. 819 ("Although three days of *voir dire* in this case were open to the public, *six weeks* of [it] ... were closed" (emphasis in the original)), and in *Gibbons v. Savage*, 555 F.3d 112, 115 (2d Cir.2009) ("Jury selection was conducted over several days.").

ord suggests that this is a case "where it is or could be charged that the judge deliberately enforced secrecy in order to be free of the safeguards of the public's scrutiny." *Levine*, 362 U.S. at 619–20, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960). Nor is this a case in which it is likely that, if spectators had been permitted to remain in the courtroom during *voir dire*, they "would in the slightest have affected the conduct of the proceedings or their result." *Id.* As noted above, the court's discussion of the government's proposed *voir dire* questions was conducted in open court before the trial judge asked spectators to leave the courtroom, as were the trial judge's acknowledgment of his background in the military and active reserve status and his question to appellant about whether appellant would "like to voir dire the Judge." Once *voir dire* started (with the courtroom then closed), the court turned on the "husher" [13] during the questioning of each prospective juror (an action to which appellant has raised no objection). Thus, had they remained in the courtroom, spectators would not have been able to hear the questions that the court, the prosecutor, and appel-

lant posed, or the exchanges with each prospective petit juror.[14] The undoubted value of an open courtroom is that it "gives assurance that established procedures are being followed and that deviations will become known" and thereby "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press–Enterprise*, 464 U.S. at 508, 104 S.Ct. 819. This assurance is particularly important in a case such as this, where the conduct for which appellant was charged involved protected political speech and policy views of public interest. But here, especially given the (unobjected-to) use of the husher during the individual juror interviews, we cannot say that allowing the courtroom to remain open during the relatively short *voir dire* would have contributed appreciably to those goals.[15] We therefore see no basis for concluding that the error that appellant has identified seriously compromised the fairness or integrity of his trial.

## II.

■■■ Appellant's remaining arguments focus on the *voir dire* examination itself.

---

**13.** A "husher" is a mechanical, white noise device intended to foster the confidentiality of conversations at the bench (in this case, to protect the privacy of prospective jurors).

**14.** *Cf. Gibbons*, 555 F.3d at 120–21 (holding, in preserved-error case, that the courtroom closure in issue was "too trivial to warrant the remedy of nullifying an otherwise properly conducted state court criminal trial," and reasoning that even if the lone spectator had not been excluded, she "would not have been able to watch a significant portion of what occurred during that afternoon session because the private interviews of individual jurors as to their reasons for inability to serve were justifiably conducted in an adjacent room out of the hearing and sight of the other jurors"; and that "nothing of significance happened during the part of the session that took place" in open in the courtroom.); *Kelly v. State*, 195 Md.App. 403, 428, 6 A.3d 396

(2010) (holding, after "[a]nalyzing all the circumstances of this case," that the courtroom closure was de minimus [sic] and did not implicate appellant's Sixth Amendment constitutional right to a public trial because the closure was of "limited duration ... [i.e.,] two to three hours during voir dire" and "a significant portion of the proceedings ... were not even audible to spectators in the courtroom").

**15.** As the Supreme Court recognized in *Waller*, the right to a public trial also "ensur[es] that judge and prosecutor carry out their duties responsibly, ... encourages witnesses to come forward and discourages perjury." 467 U.S. at 46, 104 S.Ct. 2210. We do not discern that the goals of encouraging witnesses to come forward and to discourage perjury were implicated by the courtroom closure here.

In reviewing appellant's claims, we are guided by the principle that the trial court has "broad discretion in conducting *voir dire* examination." *Murray v. United States*, 532 A.2d 120, 122 (D.C.1987). We will not reverse a trial judge's ruling regarding the content and scope of *voir dire* "absent an abuse of discretion and substantial prejudice to the accused." *Id.* (citations omitted). The trial judge's broad discretion over the *voir dire* process extends to decisions "to strike a juror for cause[.]" *Ahmed v. United States*, 856 A.2d 560, 563 (D.C.2004) (per curiam) (citation omitted).

## A.

Appellant's first argument focuses on Jurors 600 and 720. During *voir dire*, the trial judge asked Juror 600 if she "could ... listen to the law as I give it to you, and be fair and impartial in this case[,]" to which Juror 600 responded, "I don't feel impartial .... because I feel very partial about the law right now. I have issues with the system, and the fact that we have real criminals running around." Without objection from appellant, the trial judge granted the government's motion to strike the juror for cause.

In responding to the written *voir dire* questions given to prospective jurors, Juror 720 indicated that he would be "unable to decide this case." At the bench, the following discussion occurred between Juror 720 and the court:

> JUROR 720: I consider myself a bit of a libertarian. I don't know anything about the particulars. I don't know Mr. Barrows. But just on the basis of what you said, this doesn't sound like a very serious crime, or charge. It seems kind of frivolous, on the face of it. Again, I don't know the details ... of why he was protesting, or what he was doing blocking the business of the

Congress. ... If it was a more serious crime—if he had shot someone—then you would have indicated that. So it ... doesn't seem like a very serious crime to me—and as a libertarian ... I'm going to be inclined to—particularly, if he's protesting the war, the symbolism of September 11th—we're all familiar with. I don't know, again, what he was doing, but it just doesn't seem very serious to me, on the face of it.

> ...

> COURT: You're here to decide this case based only on the facts and the law.

> JUROR 720: Okay.

> COURT: And if you can't apply the facts or the law to the facts, and if you can't be fair and impartial, then you can't be a juror.

> JUROR 720: I'm not—again, without knowing the details—I'm not sure, as this proceeds, that I would be. I would probably be inclined to dismiss the charges if it is, in my opinion, somewhat sort of frivolous.

The government then moved to dismiss, and the court granted the motion without objection.

 Appellant contends that the court erred in striking jurors 600 and 720 for cause, contending that their dismissals "skew[ed] the jury in favor of the government." However, his failure to object in the trial court limits our review to a plain-error analysis, and we discern no plain error. The purpose of *voir dire* is to "obtain[ ] an impartial jury, in part by disqualifying biased jurors." *Doret v. United States*, 765 A.2d 47, 53 (D.C.2000). The task is made easy when the court has "received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* That is precisely what

occurred here. Juror 600 said unequivocally that she "[didn't] feel impartial" and Juror 720 said that he was "not sure … that [he] would be [fair and impartial]." *Cf. United States v. Nell*, 526 F.2d 1223, 1230 (5th Cir.1976) (reading prospective juror's "statements during the voir dire as an express admission of bias" because "[n]ever once did he say that he would be able to render a fair and impartial verdict"). Moreover, Juror 600 admitted to having "issues with the system, and the fact that we have real criminals running around" and Juror 720 responded that the crime that appellant had been charged with committing "doesn't sound like a very serious crime," and "seem[ed] kind of frivolous," and said that he would "be inclined to dismiss the charges" if *he* determined that they were "frivolous." *Cf. Doret*, 765 A.2d at 54 (describing the trial court's "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions"). Because both prospective jurors' responses reasonably could have been perceived as exhibiting actual bias against the government, and because the government "has as much right to an impartial jury as the defendant," *United States v. Sutton*, 732 F.2d 1483, 1493 (10th Cir.1984), we cannot say that the trial court plainly erred in granting the government's unopposed motions to excuse these jurors for cause. *Cf. Nell*, 526 F.2d at 1229 ("If 'actual bias' is discovered, then the court must grant the challenge for cause").

▪▪▪ Appellant contends that the two jurors were "targeted for exclusion based on their views," resulting in a petit jury that was "unacceptably skew[ed] … in favor" of the government. We reject this characterization. The voir dire transcript shows that the court was focused on the ability of jurors to be impartial rather than on their association with particular viewpoints. For example, when the prosecutor wanted the court to strike for cause Juror 176, who said that "people [she was] close to" had participated in protesting "[t]he war going on now," the court declined to do so because the juror said that she could be "fair and impartial" (and Juror 176 went on to be seated on the petit jury). In addition, we cannot conclude from the *voir dire* proceedings as a whole that the jurors' viewpoints were skewed in favor of the government or against those who would engage in protests against war or against the actions of government officials. Among the jurors who were seated were Jurors 425, 564 and 808, who, respectively, had protested regarding the war in Vietnam, the pardon of Richard Nixon, and abortion rights issues, as well as Juror 585, who stated that she had a friend who was arrested after demonstrating against a nuclear power plant. The court struck for cause Juror 895, who said that she had "little patience for grandiosity in the guise of social conscience"; Juror 493, who worked for a member of Congress and admitted to "feel[ing] a natural irritation … of protesters coming to the Capitol grounds"; and Juror 539, who worked as chief of staff for a member of Congress and who said that "matter[s]" such as appellant was charged with "happen[ ] a lot."[16]

---

**16.** And, through peremptory strikes, one or the other party struck Juror 708, a police officer who acknowledged having arrested protesters; Jurors 082 and 279, who had relatives serving in the military in Iraq; Juror 354, who had "certain political beliefs" and had participated in demonstrations; and Juror 296, who was sure his friends had protested regarding the World Bank and "stuff like that"—i.e., jurors of seemingly diverse viewpoints.

To the extent that appellant implies that the court erred in striking for cause jurors who might have refused to convict appellant even

## B.

Before *voir dire* commenced, the court indicated that it would use a topic list of seventeen questions to pose to the jury venire members—a standard set of questions not specifically tailored to appellant's charged offense. The prosecutor proposed three additional questions. The trial judge permitted the government to ask its proposed questions (and the prosecutor repeatedly posed the questions to prospective jurors), but declined to include the three questions as part of the court's questions. Appellant did not propose any stock questions to be read to the jury venire, but posed a number of questions to prospective jurors during the individual interviews.

Before venire members were individually examined, the court read to them the charge against appellant:

> On or about September 11th, 2007, within the District of Columbia, David O. Barrows willfully and knowingly engaged in disorderly and disruptive conduct upon the United States Capitol grounds, or within any of the Capitol buildings, with the intent to impede, disrupt and disturb the orderly conduct of a session of the Congress in either House thereof, or the orderly conduct within any such building of a hearing before, and deliberations of, a committee or subcommittee of the Congress in ei-

> ther house thereof. This offense is alleged to have occurred on September 11, 2007, at 10:27 a.m., at the Hart Senate Office Building, located at 120 Constitution Avenue, Northeast, Washington, D.C.

On this record, appellant argues that the "[v]oir dire was conducted in a way that would not have detected bias against [him] based on his political views." In particular, he argues that the trial court had an obligation to ask specific questions *sua sponte* regarding his "antiwar stance and his belief that the Iraq war was fought for 'bloodlust.'" He relies on *Cordero v. United States*, 456 A.2d 837 (D.C.1983), in which we recognized that "[f]airness requires a careful *voir dire* examination when there is a 'significant likelihood' of juror prejudice," *id.* at 841 (quoting *Ristaino v. Ross*, 424 U.S. 589, 598, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976)) (other citation omitted); that a "significant likelihood of prejudice exists when (1) a case involves matters concerning which either the local community or the population at large is commonly known to harbor strong feelings, and (2) these matters are inextricably bound up with the conduct of the trial," *id.* at 842 (citations and internal quotation marks omitted); and that one of the "controversial matters requiring careful scrutiny" is "political attitudes." *Id.* (citations omitted).[17] Because the trial court in

---

if they found that he committed the act of which he was charged and that the government had proven all elements of the offense, the answer is that the court had no duty to safeguard that possibility. "[W]hile jurors have the power to nullify a verdict, they have no *right* to do so," *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir.2005) (emphasis added) (citing *Standefer v. United States*, 447 U.S. 10, 22–23, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)) (further citations omitted), and appellant had no right to ensure that his jury included individuals whose *voir dire* responses suggested that they could be expected to exercise jury nullification. The jury-selection pro-

cess "is to ensure a fair impartial jury, not a favorable one." *Press–Enterprise*, 464 U.S. at 521, 104 S.Ct. 819; *see also Lockhart v. McCree*, 476 U.S. 162, 205, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (referring with approval to the *"voir dire* needed to identify nullifiers before the guilt phase" of a capital trial); *United States v. Polouizzi*, 564 F.3d 142, 162–63 (2d Cir.2009) ("[I]t is not the proper role of courts to encourage nullification").

17. The appellant in *Cordero* was arrested after he stood up in the Senate gallery as the Senate was conducting "routine business," yelled something about "the third world war" and

*Cordero* "took no action to minimize the likelihood of prejudice to [Cordero] from the controversial matters inextricably bound up with the trial," we reversed his conviction, concluding that the "trial court abused its discretion in declining to incorporate into *voir dire* examination the substance of" the questions offered by appellant (including a question about whether any prospective juror would be prejudiced against Cordero because of his political beliefs or affiliations). *Id.* at 844.

■ The factual similarities between this case and *Cordero* are apparent,[18] and the government concedes that the factual context of the charged offense presented "a significant likelihood of juror prejudice." What distinguishes *Cordero* from this case, however, is that Cordero proposed and the trial court rejected several *voir dire* questions relating to his political affiliation and viewpoints, while here appellant proposed

no *voir dire* questions for the court to pose and took no issue with the court's not having included questions regarding the potential offensiveness of appellant's political views or of his characterization of the war. Thus, unlike Cordero's claim, appellant's claim is subject to the strictures of plain-error review.[19]

■ Appellant argues that the plain-error standard of review should not apply because "the burden [was] on the trial court to assure that the jury was fair and impartial." This argument overlooks that "[h]ow [the] biases [of prospective jurors] will be uncovered during *voir dire* is left to the trial court's broad discretion." *Matthews v. United States*, 599 A.2d 1389, 1389 (D.C.1991) (citation omitted). Under Super. Ct.Crim. R. 24(a), "[t]he Court may permit the defendant or the defendant's attorney and the prosecutor to conduct the examination of prospective jurors or may

"revolution" and the "killing of people in Vietnam," and threw leaflets in the air. 456 A.2d at 840. Prior to *voir dire*, the trial judge informed the prospective jurors that appellant was charged with "Disrupting Congress in that he uttered loud language in Senate Gallery No. 8, disturbing the orderly conduct of a session of Congress." *Id.* at 839. Cordero's counsel "proposed 38 *voir dire* questions, ... including questions that would have probed the potential jurors' attitudes toward someone who had made a speech denouncing the United States for 'planning World War III' and who was a member of Vietnam Veterans Against the War and the Revolutionary Communist Party." *Id.* The judge rejected the questions and instead asked the prospective jurors seven questions, none of which bore on Cordero's political attitudes except arguably question three, which asked "whether any of them or any of their close relatives had ever been charged with, the victim of, or witness to a 'disturbing the peace type' offense[.]" *Id.* We observed that Cordero's "political views and associations, especially his advocacy of 'revolution' and his membership in the Revolutionary Communist Party, constitute matters concerning which the population at large is commonly known to harbor strong feel-

ings." *Id.* at 844 (citation and internal quotation marks omitted). We reasoned that Cordero's "controversial political views and affiliations" were "inextricably bound up with the conduct of his trial" because "[t]hey were among the most basic facts underlying his alleged offense" and "would be evident to the jury as soon as the jury learned ... what he said in his protest statement and had the opportunity to examine his leaflet." *Id.* at 844.

18. As in *Cordero*, the trial judge "did not outline the facts of the case to the prospective jurors in a way that alerted them to the [particular] political issues involved." 456 A.2d at 844.

19. *Cf. Harlee v. District of Columbia*, 558 A.2d 351, 354 (D.C.1989) (reviewing for plain error appellant's claim, in a case involving indecent exposure to a child, that trial court improperly "neglect[ed] to question the panel as to 'prejudices involving men,'" because "[a]ppellant made no such request of the trial court and did not himself question the jury on the issue of whether they had any special prejudices involving men").

itself conduct the examination. In the latter event the Court shall permit the defendant or the defendant's attorney and the prosecutor to supplement the examination by such further inquiry as it deems proper." If the trial court affords both parties the opportunity to supplement its *voir dire* questions, as the court undisputedly did here,[20] it is immaterial that the trial court's own questions do not ferret out every potential bias that a prospective juror could have. *See Doret,* 765 A.2d at 54 (noting that the proper inquiry is whether "the trial court ask[ed], *or permit[ted] the parties to pose,* sufficient questions to determine whether seven jurors should have been struck for cause" (emphasis added)); *Cordero,* 456 A.2d at 841–42 ("At a minimum, *when requested by counsel,* inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury.") (quoting *United States v. Dellinger,* 472 F.2d 340, 368 (7th Cir.1972)) (emphasis added). This is no less true in cases such as this one, where the parties agree that there was a significant potential for juror prejudice. *Cf. Rosales–Lopez v. United States,* 451 U.S. 182, 191, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) ("In our judgment, it is usually best to allow the defendant to ... mak[e] the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued."); *Matthews,* 599 A.2d at 1390 (explaining that "drug-related crime" is one of "several controversial matters requiring careful inquiry during *voir dire* " and that, in an appropriate case, a *voir dire* question regarding drug use "should generally be asked ... *if either counsel requests it* ") (internal quotation marks omitted) (emphasis added). Accordingly, the trial court did not plainly err in failing to ask questions *sua sponte* during *voir dire* related to appellant's antiwar stance.[21] *Cf. Mills v. United States,* 796 A.2d 26, 36 (D.C. 2002) (discerning no constitutional error or an abuse of discretion in the trial court's handling of the *voir dire* where "defense counsel did not advise the trial judge, before the *voir dire* process, of the specific question he wished to have posed to potential jurors").

## C.

Finally, appellant argues that the trial court committed reversible error in allowing the government to ask prospective jurors the question, "Were you, or any close relative, injured during the Septem-

20. The court said to the parties, "[Y]ou all can take a look at [my *voir dire* questions], and whatever additional questions you have I'd like for you to let me know, and you can ask the questions at the bench." The trial judge also told the parties that his "voir dire questions" are "very generic," and, therefore, the parties should "look at ... the voir dire questions .... [a]nd whether or not you have any corrections or objections, okay. And whatever additional questions you want to ask, you have to run them by me before you start asking." Appellant asked a number of questions of prospective jurors (for example, asking Juror 708 whether he had ever arrested protesters).

21. Questions 16 and 17 to the jury venire asked, "Is there any reason that the nature of the offense alleged here might make it difficult for you to fairly decide this case?" and "Is there any other reason that you can think of—whether or not it has been covered by a previous question—of why you could not be a fair and impartial juror in this case?" We do not suggest that such questions would have been sufficient to expose prejudice regarding appellant's political views had appellant offered any questions on the topic himself. *See Cordero,* 456 A.2d at 844–45. But in light of his failure to do so, we do note that the court's questions generally incorporated the issue of appellant's political attitudes and viewpoint, in such a way that the court could have discerned potential bias regarding appellant's political views.

ber 11, 2001 attacks? If yes, will your or your relative's injuries prevent you from being fair and impartial during the trial?" Appellant contends that this question "improperly linked [his] nonviolent political activity to terrorism." [22]

We are satisfied that the court did not abuse its discretion in permitting the government to ask the September 11 question. Had the only connection between appellant's arrest and the September 11, 2001 terrorist attacks been that they occurred on the same day of the year, we might agree that the question was not a proper one for *voir dire*.[23] However, the record suggests that the scheduling of the Senate hearing on the anniversary of the September 11, 2001 attacks was not happenstance, and that a focus of the hearing was the United States's military involvement in the Middle East post-September 11, 2001. Thus, appellant's assertion that the government was permitted to ask the September 11 question because of the "mere coincidence that [his] alleged conduct took place on September 11, 2007" is not entirely accurate. The government's question was relevant at least to the extent that it provided the "opportunity to expose bias or prejudice," *Finley v. United States*, 632 A.2d 102, 104 (D.C.1993), of jurors who, because of any September 11, 2001–related sentiments, might, upon learning the details of the case, render a verdict based on an emotional response to the fact that appellant's protest action related to the conduct of government affairs in the wake of the events of that date. *Cf. Chatmon v. United States*, 801 A.2d 92, 100 (D.C.2002) (referring to the need to ensure that jury verdicts are not based on "the emotional response of inflamed passions").

And, in any event, we are not persuaded by appellant's argument that the September 11 question prejudiced him at trial by "link[ing] his nonviolent expression of dissent to the criminal acts of terrorists." Indeed, appellant suggests that Juror 720 "speculated out loud what all of the jurors must have been thinking" when he said "that the case might involve Mr. Barrows 'protesting the war, the symbolism of September 11th[.]'" Far from forming a negative view of appellant or linking his actions to the criminal acts of terrorists, Juror 720 considered the charges against appellant "kind of frivolous" and not "very serious."

For all of the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

---

**22.** When the government proposed its supplemental *voir dire* questions, appellant objected to the September 11 question, saying that "it could be emoting a response from jurors coming up. It might be exciting some memory.... The only thing I could object to is just kind of getting little kind of panic back. I don't know.... It could be prejudicial." The court informed the parties that it would "allow [them] to ask the questions at the bench" and that he would "not ... put them in [his] topic list, or ... instructions...." The prosecutor later explained that she proposed the September 11 question "because September 11th was the date that the incident occurred, and ... sometimes just saying September

11th over and over again, or the people"— and the court interjected, "Well, that's why I'm not going to say it to the entire body. If you want to say it at the bench, you can."

**23.** *Cf. People v. Esquivel*, 46 A.D.3d 394, 848 N.Y.S.2d 621, 621 (N.Y.App.Div.2007) (criticizing prosecutor's emphasis during opening summation and closing argument "on the fact that the incident took place ... a few months after the September 11, 2001 terrorist attacks" when defendant had been charged with a robbery that apparently was not connected to the events of that September 11).