**Antonio WILLIAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–1148.

District of Columbia Court of Appeals.

Submitted May 26, 2011.

Decided Sept. 13, 2012.

Barbara E. Kittay for appellant.

Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, Kristina L. Ament and Elizabeth H. Danello, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE–RIGSBY, Associate Judge, and NEBEKER and RUIZ,* Senior Judges.

RUIZ, Senior Judge:

Antonio Williams appeals his convictions of first-degree theft,[1] destruction of property,[2] contempt,[3] and obstruction of justice[4] in connection with several incidents of domestic violence. On appeal, he argues (1) that the evidence was insufficient to support the conviction for contempt, (2) that the court improperly instructed the jury on the intent element of contempt, (3) that the court erred in failing to give a unanimity instruction on the charges of contempt and obstruction of justice, and (4) that a portion of the jury selection violated his right to a public trial. We affirm.

## I. Facts

Appellant met the complainant, Mable Flood, in mid-September 2005 and the two began a romantic relationship soon thereafter. The relationship progressed to the point that appellant began living with Flood and her two-year-old son, in Flood's apartment at 3392 Blaine Street Northeast in the District of Columbia. Soon, however, their relationship developed *conflicts that involved violence.* Flood testified that

---

* Judge Ruiz was an Associate Judge of the court at the time the case was submitted. Her status changed to Senior Judge on July 2, 2012.

1. D.C.Code §§ 22–3211, –3212 (2001).

2. D.C.Code § 22–303 (2001).

3. D.C.Code § 11–944(a) (2001).

4. D.C.Code § 22–722(a)(2)(A) (2001).

on December 3, 2005, after an argument about another man calling the apartment, appellant "grabbed" a knife and "came towards" her as she was lying in bed.[5] She was able to stop the knife from striking her by grabbing appellant's hand. Her son, who was sleeping next to her in bed, woke up screaming, and appellant left the room. Flood testified that she did not call the police because she "had feelings" for appellant and she wanted to help him. Appellant continued to stay with Flood in her apartment.

On December 24, 2005, appellant and Flood had an argument over the length of time that Flood had left her son with appellant while she visited with family at the home of her sister Dolores. Dolores had accompanied Flood back to the apartment and intervened in the argument by telling Flood not to "run." The argument continued and Dolores "grabbed" appellant around the neck. In response, appellant threatened to hurt Dolores. After appellant left the apartment, Flood called the police. Her nephew changed the bottom lock on her apartment door that night, and Flood and her son spent Christmas eve at Dolores's house. While Flood was at Dolores's house that night and the next morning, appellant called Flood "a lot" of times from Flood's apartment. Flood testified that the conversations contained "a lot of arguing, lot of cursing," but she could not recall any specifics.[6] When Flood returned home the following day, December 25, with her son and her oldest nephew,

she found the apartment "trashed." The contents of the refrigerator had been thrown on the walls; the words "Bitch, fuck you" had been inscribed on a wall; plants had been dumped on the carpet; two television sets had been destroyed; and the family's fish had been killed. The Christmas tree also was "trashed" and Flood's son's Christmas toys were missing, along with his Playstation video game console and his bed. The oven was left on broil and the bathtub was stopped up.

On January 17, 2006, an arrest warrant was issued for appellant. On March 4, 2006, Flood encountered appellant riding a bicycle on the 3300 block of Blaine Street Northeast. She invited appellant to her apartment, but the two soon began arguing in the bedroom. When police knocked on the door shortly thereafter, appellant hid in the closet, Flood answered the door, let the officers into her apartment, and told them that appellant was not there.[7] The officers went into the bedroom, found appellant, and arrested him. Appellant and Flood continued to communicate after his arrest. At trial, the government played a tape of a telephone conversation between appellant and Flood, in which appellant urged Flood not to testify in court. In addition, the government introduced into evidence a letter that appellant wrote to Flood at some point after the telephone conversation, asking Flood not to come to court. Flood acknowledged at trial that she still had feelings for appellant, and

---

5. Flood initially testified that she did not recall any words that appellant said to her during the altercation. Later, however, she acknowledged that she testified before the grand jury that when she woke up on December 3, appellant "was still mumbling and arguing and cussing, and he said something to me in the nature of [']bitch, you don't know who you are dealing with['] or [']I'll kill you.[']"

6. Flood was impeached with her grand jury testimony in which she testified that appellant told her that he would kill her and her sister and that he would "get to" her son.

7. Flood testified at trial that she denied appellant's presence in the apartment because she did not want anyone hurt in front of her son and because she still "cared about [appellant] deeply."

that she testified at trial because she had been subpoenaed to do so.

Appellant was charged with one count of assault with a dangerous weapon (ADW), three counts of threats, one count of second-degree burglary, one count of destruction of property, one count of first-degree theft, one count of contempt, and one count of obstruction of justice. At the close of trial, the court dismissed one count of threats against appellant. The jury acquitted appellant of ADW, the two remaining counts of threats, and burglary. The jury convicted appellant of destruction of property, first-degree theft, contempt, and obstruction of justice. Appellant was sentenced to seven months of imprisonment for contempt, followed by concurrent terms of eighteen months of imprisonment for destruction of property and theft and seventy-two months for obstruction of justice, and concurrent three-year terms of supervised release.

## II. Contempt

Appellant argues that the evidence was insufficient to support his conviction for contempt because there was no evidence that a stay-away order issued on October 25, 2005 was in effect during the period charged in the Complaint, from December 3, 2005, to March 4, 2006. Although there was no direct evidence on the point, we conclude that the evidence was sufficient to support the contempt conviction because a juror could reasonably have inferred from the date the stay-away order was issued that it was still in effect during the relevant time period.

 We will reverse a conviction for insufficiency of the evidence " 'only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt.' " *Anderson v. United States*, 857 A.2d 451,

463 (D.C.2004) (quoting *Zanders v. United States*, 678 A.2d 556, 563 (D.C.1996)).

At trial, the parties stipulated as follows:

The parties agree that on October 25th, 2005, a District of Columbia Superior Court judge ordered the defendant, Michael Kirk, to stay away from the 3300 block of Blaine Street, Northeast, in the District of Columbia. The order was issued in a case unrelated to the current case against Mr. Kirk. Mr. Kirk acknowledged in open court that he understood the order and signed a document to that effect.

(The "Michael Kirk" referred to in the stipulation is appellant; that is the name by which the witnesses knew him.) No other details about the order were stipulated, or presented to the jury. The order was not introduced into evidence.

 The offense of contempt requires " 'both a contemptuous act and a wrongful state of mind.' " *Davis v. United States*, 834 A.2d 861, 866 (D.C.2003) (quoting *Swisher v. United States*, 572 A.2d 85, 89 (D.C.1990)); *see* D.C.Code § 11–944 (2001). Thus, to prove criminal contempt that rests on violation of a court order, "the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order." *Ba v. United States*, 809 A.2d 1178, 1183 (D.C. 2002). "Compliance with court orders is required until they are reversed on appeal or are later modified." *In re Dixon*, 853 A.2d 708, 711–12 (D.C.2004).

 Viewed "in the light most favorable to the government," the evidence was sufficient to support appellant's conviction for contempt. *Dickerson v. United States*, 650 A.2d 680, 683 (D.C.1994). It was undisputed that appellant had been ordered on October 25, 2005, to stay away from the 3300 block of Blaine Street Northeast.

Appellant had acknowledged that he understood the order. Even though the order was entered in an unrelated case, it pertained to the same block where Flood's apartment was located, at 3392 Blaine Street. The government presented evidence showing that appellant began living in Flood's apartment some time after they met in mid-September 2005, and that on at least three specific dates—December 3 and 24, 2005, and March 4, 2006—he was in her apartment where he threatened and argued with Flood and "trashed" her apartment and possessions. A reasonable juror could infer from this evidence that appellant knew that by being present in Flood's apartment, he was disobeying the stay-away order.

Appellant argues, however, that there was no evidence from which the jury could infer that the stay-away order was in effect during the period, December 3, 2005– March 4, 2006, identified in the Complaint. It is true that the government did not present any *direct* evidence that the stay away order was in effect on any of the three specific dates the government alleged that appellant was at Flood's apartment; as mentioned, the order itself was not introduced into evidence. The jury was not limited, however, to considering only direct evidence that the order was in effect, nor was the jury limited to finding contempt based only on the three specific dates when appellant engaged in violent behavior, so long as appellant visited the prohibited block on Blaine Street during the four-month period in the Complaint.

*See Dickerson*, 650 A.2d at 683 ("No distinction is drawn between direct and circumstantial evidence."). Flood testified that she met appellant on September 15, 2005, and began to see appellant "every day" two weeks later. Even though appellant did not agree to "at first," he eventually had keys to her apartment and stayed "every night." When asked about the state of their relationship "as the fall went on," Flood said it was "good" and that appellant helped out and took care of her son at her home. Thus, there was ample evidence from which the jury could find that appellant frequented Flood's apartment located in the area that was made off-limits by the stay-away order both immediately before and immediately after the order was issued, on October 25.[8] We cannot similarly say there was ample evidence of how long the order continued to be in effect, but there also was no indication that the stay-away order had been rescinded or expired by December 3, less than two months after it was issued.[9] This was the date when appellant threatened Flood with a knife, and marked the beginning of the period alleged in the Complaint. Indeed, it appears from the record that the continued effectiveness of the court order that appellant had stipulated to was a non-issue at trial, as defense counsel did not even mention the contempt charge at all during closing argument. Under the circumstances, the jury could reasonably find that the stay-away order was in effect at least during part of the period charged in the Complaint and that

8. Even though this evidence clearly supported that appellant violated the stay-away order, it was not within the four-month period specified in the Complaint, which began on December 3.

9. In its brief, the government argues that the continued effectiveness of the court's order is presumed and offers additional details about the stay-order, noting that it was issued "as part of the conditions of release in a misdemeanor case." None of this was presented to the jury in this case, however, and we are limited to the evidence presented at trial in reviewing appellant's claim of evidentiary insufficiency. The obvious, and clearest, evidentiary path would have been for the government to introduce the stay-away order itself.

appellant violated the order by staying in Flood's apartment during that time.

Appellant contends that, even if the evidence was sufficient, the contempt conviction must be reversed because the trial court's instruction to the jury inadequately defined the intent necessary for contempt. The government counters that the contempt instruction was correct, and that even if the instruction was erroneous, it was not plainly so.

 Because appellant did not object to the jury instruction at trial, our review is for plain error. *See Graham v. United States,* 12 A.3d 1159, 1168 (D.C.2011). "Under the plain error standard ... [appellant] not only must establish 'error,' but also that the error is 'plain' and 'affect[s] substantial rights.'" *Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001) (second alteration in original) (quoting *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). "If he satisfies these three hurdles, he must then show either a 'miscarriage of justice,' that is, actual innocence; or that the trial court's error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano,* 507 U.S. at 736, 113 S.Ct. 1770).

█ To determine whether there was error, we consider "whether the instruction 'is an adequate statement of the law, and whether it is supported by evidence in the case.'" *Scott v. United States,* 954 A.2d 1037, 1045 (D.C.2008) (quoting *Wheeler v. United States,* 930 A.2d 232, 238 (D.C. 2007)). Here, the trial court instructed the jury as follows:

> The elements of contempt each of which the government must prove beyond a reasonable doubt are number 1, that the defendant was subject to a court order. Number 2 that the defendant engaged in conduct that violated the Court order.

And number 3 that the defendant engaged in this conduct willfully. Willfully means that the defendant knew what he was doing. It does not mean that he knew he was breaking the law.

 "Willful disobedience is found when one 'intentionally violate[s]' a court order." *Payne v. United States,* 932 A.2d 1095, 1099 (D.C.2007) (alteration in original) (quoting *Grant v. United States,* 734 A.2d 174, 177 (D.C.1999)). Willfulness necessarily entails knowledge that conduct is proscribed, *see id.* at 1099–1100, *i.e.,* a " 'wrongful state of mind.' " *Davis,* 834 A.2d at 866 (quoting *Swisher,* 572 A.2d at 89). The trial court's instruction, that "[willfully] does not mean that he knew he was breaking the law" could have been misinterpreted as saying that the defendant need not have understood the terms of the stay-away order and, to that extent, it was not a correct statement of the law. In determining whether this defect in the instruction prejudiced appellant's substantial rights, we do not look at the instruction in isolation, however, but in the context of the evidence presented in the case. Once it was established that appellant understood the terms of the court order—as was stipulated by the parties in this case— "[p]roof of the intent element of criminal contempt only requires proof that the appellant intended to commit the actions constituting contempt." *Grant,* 734 A.2d at 177 n. 6. In other words, a defendant willfully disobeys a known court order by *intentionally committing the act* that violates the terms of the order. *See, e.g., Payne,* 932 A.2d at 1099–1100 (concluding that willful disobedience could be shown by the appellant intentionally approaching the complainant after a court order required him to stay away); *Baker v. U.S.,* 891 A.2d 208, 215 (D.C.2006) (concluding that "willful disobedience" could be shown by the appellant's intentional communication with the complainant after the appellant "ac-

knowledged that he understood the court's order that he not have direct or indirect contact with her").[10] In light of the stipulation that appellant understood the terms of the stay-away order, the trial court's instruction to the jury that to find appellant guilty of contempt, appellant must be found to have "engaged in conduct" that violated the terms of the order and that he "knew what he was doing"—by going to the 3300 block of Blaine Street, Northeast—sufficed to instruct the jury on the law as it applied to this case. There was no plain instructional error warranting reversal.

### III. Unanimity Instruction

■ Appellant argues that his convictions for contempt and obstruction of justice were constitutionally deficient because each count alleged multiple incidents and the trial court did not give a unanimity instruction that required the jury to agree on a particular incident as a basis for conviction. The government counters that the trial court was not obligated to provide the jury with a unanimity instruction. Because appellant also failed to preserve this issue at trial, we again review for plain error. *See Howard v. United States,* 867 A.2d 967, 974 (D.C.2005).

■ "The constitutional right to a unanimous jury verdict ... is a principle long assumed to be an indispensable feature of the sixth amendment right to trial by jury." *Scarborough v. United States,*

522 A.2d 869, 873 (D.C.1987). A unanimity requirement is appropriate "whenever there is evidence tending to show legally separate incidents ... not just factually separate incidents." *Id.* Therefore, a trial court must provide a unanimity instruction "where 'a single count encompasses two or more factually or legally separate incidents,' " *Washington v. United States,* 760 A.2d 187, 197 (D.C.2000) (quoting *Parks v. United States,* 627 A.2d 1, 8 (D.C.1993)), because "[w]hen a single count encompasses factually separate criminal incidents, each incident is not merely an alternative 'means' of committing an element (or multiple elements) of the charged offense; rather, each incident actually constitutes one or more elements of the offense...." *Williams v. United States,* 981 A.2d 1224, 1230 (D.C.2009). In such cases, jurors must agree on which incident satisfied the element (or elements) of the criminal offense. *See id.*

■ Even if we assume that the trial court's failure to give a unanimity instruction was obvious error,[11] however, appellant cannot " 'show that the lack of a unanimity instruction jeopardized the fairness and integrity of his trial.' " *Howard,* 867 A.2d at 975 (quoting *McKinnon v. United States,* 644 A.2d 438, 441 (D.C.1994)). First, with regard to the contempt conviction, there is ample evidence from which the jury would have unanimously agreed that appellant violated the terms of the stay away order. Appellant stipulated he

---

10. *See also* Criminal Jury Instructions for the District of Columbia, No. 6.100 A. (5th ed. 2011) ("[Name of defendant] violated the order[s] voluntarily and on purpose, and not by mistake or accident.").

11. Appellant and the government disagree over whether the analysis we have adopted with respect to separate factual incidents in the above-cited cases is in tension with the Supreme Court's opinion in *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d

555 (1991), and *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). *See Washington,* 760 A.2d at 198 ("*Schad* and *Scarborough* differ somewhat in their reasoning, and this court has never addressed the apparent inconsistencies between the two."). As we assume that the failure to give a unanimity instruction was clearly erroneous, we need not resolve their disagreement in this appeal.

knew that he was prohibited by the stay away order from entering the 3300 block of Blaine Street, Northeast. The jury, in finding appellant guilty of destruction of property and theft stemming from the December 25th "trashing" of Flood's apartment, necessarily had to find that appellant was present within the 3300 block of Blaine Street on that day. Insofar as the record demonstrates that the jury found that appellant was in the complainant's apartment on December 25, we see no substantial prejudice to appellant caused by the trial court's failure to provide a unanimity instruction to the jury with respect to other incidents that also could have supported conviction on the contempt charge.

Second, with respect to the obstruction of justice conviction, appellant conceded in opening statement and closing argument that appellant had called Flood "ask[ing]" and "begg[ing]" her "not to come to court." On appeal, he suggests several benign interpretations that the jury could have applied to either one or both of his pleas. As a result, he argues, it is possible that some jurors could have found him guilty of obstruction based on the phone call and others based on the letter. Appellant's explanations, however, are directly contradicted by the phone call itself (which was played for the jury), and, in the case of the letter (which asked Flood "please pretty please don't come to court") are irrelevant to the offense. See Jones v. United States, 999 A.2d 917, 921 (D.C.2010) (noting that obstruction of justice statute does not require success, only that defendant "have made any effort or essay to accomplish the evil purpose that the statute was enacted to prevent"). With the fact and content of both the phone call and letter beyond dispute, and no legally viable innocent explanation for either one, we would be required to assign irrational motives to the jury to conclude that the verdict was based

on different factual incidents. This we will not do. See Scarborough, 522 A.2d at 874 ("[W]e are not permitted to find reversible error when the only basis for perceiving the jury's verdict was not unanimous would be that the jury acted irrationally"). As there was ample evidence from which the jury would rationally and unanimously conclude that appellant obstructed justice, appellant cannot demonstrate substantial prejudice or manifest injustice caused by the absence of a unanimity instruction.

Thus, the trial court's failure to give a unanimity instruction, even if erroneous, does not warrant reversal of the convictions for contempt and obstruction of justice on plain error review.

## VI. Right to a Public Trial

■ Finally, appellant argues that his right to a public trial was violated by the court's decision to conduct part of the *voir dire* in a jury room, rather than in open court. Because appellant did not object to the court's *voir dire* proceedings at trial, we review this claim for plain error as well. See Barrows v. United States, 15 A.3d 673, 677 (D.C.2011).

■ The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI. The Supreme Court has deemed it "well settled" that the Sixth Amendment right to a public trial extends to jury *voir dire*. See Presley v. Georgia, 558 U.S. 209, 130 S.Ct. 721, 723–24, 175 L.Ed.2d 675 (2010). Therefore, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," including *voir dire* proceedings. Id. at 725.

■ We have recently noted the "strong language" of the Supreme Court in *Presley* and our own cases to conclude

that "the error in excluding members of the public from the courtroom during *voir dire* (without a compelling reason and consideration of alternatives as described in *Waller* [*v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) ] ) was an obvious, and thus 'plain,' error at the time of appellant's trial." *Barrows v. United States*, 15 A.3d 673, 679 (D.C.2011) (citing *Kleinbart v. United States*, 388 A.2d 878, 881 n. 4 (D.C.1978)). In *Barrows*, the trial court announced it would exclude members of the public during the time it took to conduct *voir dire* in order to accommodate the large number of potential jurors in the *venire*. *See id.* at 676. Citing *Presley*, we held it was obvious error to do so. *Id.* at 679. Similarly, the trial court's decision in this case to conduct individual *voir dire* in the jury room for several hours, where it was removed from public view, was error and the error was obvious. First, we perceive no difference of significance for Sixth Amendment purposes between excluding the public from the courtroom during *voir dire*, as in *Presley* and *Barrows*, and removing the *voir dire* proceedings from the courtroom to another location from which the public is excluded. Second, even if some type of accommodation for the prosecutor's disability might have been appropriate, there appears to have been no evaluation whether the presence of the prosecutor's guide dog and paralegal presented an "overriding interest that is likely to be prejudiced" unless the individual *voir dire* questioning was removed from the courtroom, nor was there consideration given to "reasonable alternatives" that did not exclude the public, or "findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct.

2210, *quoted in Barrows*, 15 A.3d at 679 n. 8).[12]

As the government concedes in its brief, this type of error is "structural" in nature, and under our cases meets the "substantial prejudice" prong of plain error review. *See Barrows*, 15 A.3d at 678 ("The government also acknowledges that the error was structural and that, under this court's jurisprudence, we must assume that it affected appellant's 'substantial rights.'"). This, however, does not end our analysis. Appellant must still demonstrate how the closure of the *voir dire* in his case seriously affected "the fairness, integrity or public reputation of the judicial proceedings." *See id.* at 680 ("We also take heed of the Supreme Court's recent admonition that the fourth prong test 'is meant to be applied on a case-specific and fact-intensive basis,' and that a 'per se approach to plain-error review is flawed.'" (quoting *Puckett v. United States*, 556 U.S. 129, 142, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009))). It is on this last measure that appellant's claim of plain error founders.

■■■ Appellant has not shown how the partial closure of the *voir dire* proceedings to the public "seriously" affected the "fairness, integrity or public reputation" of judicial proceedings. The record demonstrates that the court conducted the general *voir dire* in the courtroom and then moved the *voir dire* of individual jurors to a jury room to accommodate the visually impaired prosecutor, who needed the assistance of a guide dog and paralegal. This unobjected-to accommodation does not cause serious disrepute to the overall judicial process, particularly in light of the reason that gave rise to the change in venue. *See id.* at 680–81 ("[N]othing in

12. The court, hearing no objection, simply acceded to the prosecutor's request, that it is "sometimes easier, having a paralegal and a

dog, to [conduct individual *voir dire* ] in the jury room."

the record suggests that this is a case 'where it is or could be charged that the judge deliberately enforced secrecy in order to be free of the safeguards of the public scrutiny.'" (quoting *Levine v. United States*, 329 U.S. 610, 619–20 (1960))). Nor did it affect the fairness of appellant's trial when appellant, his attorney, the prosecutor, the trial judge, and the court reporter were all present in the jury room for individual *voir dire*.

We recognize that there is an independent value in the public's ability to observe criminal trials, because an open courtroom "gives assurance that established procedures are being followed and that deviations will become known," thereby "enhanc[ing] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Barrows*, 15 A.3d at 681 (quoting *Press–Enterprise Co. v. Superior Ct. of Cal., Riverside Cty.*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). From that perspective, in this case the public had access to general *voir dire* questioning in the open courtroom where spectators could both see the prospective jurors and hear the *voir dire* questioning. The only portion of the proceedings shielded from public view was the individual questioning, when the court usually conducts individual *voir dire* at the bench with the "husher" activated. *See id.* at 681. As a practical matter, then, the only signifi-

cant difference between the typical *voir dire* procedure and the procedure employed here was that the spectators could not see each juror as he or she conversed with the judge and counsel at the bench. Moreover, as in *Barrows*, the trial court announced the procedure to be followed in open court and explained that proceedings would return to the courtroom after *voir dire* was completed. In this case, in addition, prospective jurors and members of the public remained in the courtroom as individual prospective jurors were called into the jury room for questioning and then returned to the courtroom. Under these circumstances, we see no serious threat to the fairness, integrity, or public reputation of the judicial proceedings caused by the court's decision to conduct the individual *voir dire* in the jury room in order to accommodate counsel's request, based on disability.

That we conclude reversal is not warranted on plain error review is not to say, however, that this kind of non-public procedure may be followed in a criminal trial as a matter of course, for the Constitution requires a public trial in criminal proceedings.[13] At the same time, the court must at times provide reasonable accommodation to enable participants in judicial proceedings—including counsel, jurors, witnesses, and judges—to have access to judicial proceedings.[14] Both are important objectives that need to be care-

---

13. Court proceedings generally are open to the public except in the limited cases where confidentiality is required by statute or rule of court. *See, e.g.,* D.C.Code § 16–2316(e) (2001); Super. Ct. Juv. R. 53.

14. *See* Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12134 (2006); *id.* at § 12132 (prohibiting discrimination on the basis of disability, or exclusion or denial to disabled individuals of the bene-

fits of "services, programs, or activities of a public entity"); *id.* at § 12131 (defining "public entity" as "any instrumentality of a State"); *id.* at § 12103(2) (defining "state" as including the District of Columbia); 28 C.F.R. §§ 35.130, -.104 (2011); *Tennessee v. Lane*, 541 U.S. 509, 517, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (noting that the ADA's Title II "requirement of program accessibility is congruent and proportional to its object of enforcing the right of access to the courts").

fully balanced in all judicial proceedings.[15]

*Affirmed.*

15. Court-wide policies and procedures may need to be developed so that the Superior Court can provide reasonable accommodation for those with disabilities while keeping all aspects of judicial proceedings open to the public.