**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Kenneth BEVLY, Defendant-Appellant.**

**No. 46992.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 10, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Denied Feb. 17, 1984.

Application to Transfer Denied
March 20, 1984.

**48**

Henry B. Robertson, Public Defender, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Lynne Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SMITH, Judge.

Defendant appeals from his conviction by a jury of first-degree murder and two counts of robbery first degree and the court imposed sentences, as a prior offender, of life imprisonment and two concurrent ten-year terms to be served consecutively to the life term. We affirm.

The victim, Eddie Pace, was the driver of an automobile containing two other passengers. He stopped late at night at a self-service gasoline filling station. As he was re-entering the vehicle two men approached and announced a "stick-up." Mr. Pace reached toward his pocket and was promptly shot. He was severely intoxicated. The robbers then demanded and received wallets from each of the passengers. The robber who shot Pace was armed with a handgun; the second man, who went to the passenger side of the vehicle, had a shotgun. The attendant at the service station had watched the two robbers standing around the station for approximately ten minutes before the robbery observing the arrival and departure of customers. During this period the attendant talked to a friend on the telephone and requested him to call the police and advise them of the presence of two suspicious persons on the premises. Following the robberies both robbers fled and the police arrived shortly thereafter. Pace was dead at the scene.

One of the robbery victims died prior to trial from a brain tumor; the other was unable to make an identification because he had heeded the warning of one of the robbers not to look at them. The attendant viewed several hundred photographs, none of them defendant's, and made no identification. Subsequently, she called the police and advised them that a picture of defendant appearing in a local weekly newspaper was a photograph of the robber who went to the passenger side of the vehicle. She thereafter identified defendant in a lineup and at trial as the non-shooting participant in the robbery. Defendant presented evidence to support an alibi. Defendant does not challenge the sufficiency of the evidence to support a conviction.

■ Defendant's first challenge is to the failure of the trial court to excuse venireman Davis for cause. A defendant is entitled to a full panel of qualified jurors before being required to make his peremptory challenges and it is reversible error for the court to deny a challenge for cause of an unqualified juror. *State v. Cuckovich*, 485 S.W.2d 16 (Mo. banc 1972) [10]. A trial court has a wide discretion, however, in determining the qualifications of a venireman and that decision should not be disturbed except for a clear abuse of discretion. The determination of the trial judge involves a judgment based on an observation of the demeanor of the venireman and an evaluation and interpretation of his answers as they relate to whether he would be fair and impartial if chosen as a juror. The trial court is in a far better position to make that determination than is an appellate court. *State v. Cuckovich, supra*, [11]; *State v. Petty*, 610 S.W.2d 126 (Mo.App.1980).

Davis had served as a military policeman during World War II and served thereafter as a police officer in California for nine months. He ceased that employment because his chief regarded him as "too tough." Davis had served for many years as chief supervisor of Emergency Medical Services in St. Louis prior to his retirement. In that position he had frequent dealings, primarily by telephone, with police officers and the medical examiner. He had a "lot of dealings" with detective sergeant Stephen Jacobsmeyer, an endorsed witness of the prosecution subsequently called as a witness only by the defense. Davis stated that his dealings with Jacobsmeyer would have no effect "whatsoever" upon his abili-

ty to determine the weight and credibility of Jacobsmeyer's testimony. Davis also knew several other endorsed police or medical examiner witnesses—"not personally" but from "phone conversations." He stated uncategorically that this knowledge would not affect his ability to judge their credibility and the weight to be given their testimony. To a general question to the panel as a whole Davis gave no answer when asked: "Is there anyone here who feels that you would either automatically believe a police officer or automatically disbelieve a police officer merely because he happens to be a police officer?"

During voir dire by defendant's attorney the following colloquy ensued:

"Q. Mr. Davis, do you think that you would be more inclined to believe the testimony of a police officer than you would another witness?

A. Well, I'll have to answer that fairly. I've been associated with them for over thirty years here in the City of St. Louis, so I would have to lean towards them, I'm almost positive of that.

Q. You'd almost be inclined to believe them over another witness?

A. They're in and out of the street every day of their lives and they know what they're talking about. They have the facts in front of them and they try to ascertain facts. They have the evidence and that's why I might be partial towards them, I'll rephrase that.

Q. So do you think there is a possibility that you might give more weight to the testimony of a police officer than you would what we call a lay witness, a civilian?

A. I don't think so, because the main purpose is to see that justice is served. I'd have to be fair and impartial.

Q. Why do you think that you'd be partial to a police officer's testimony than you would to another witness?

A. Well, more or less I guess from past experience with them ...

Q. My question to you is what has your past experience with police officers led you to conclude about them?

A. I worked with them daily, seven days a week, three hundred sixty-five days a year out of the police districts ... That just covers a multitude. I can't begin to spell it out for you.

Q. So you believe that police officers are honest?

A. The majority of them are, yes.

Q. And you think a police officer would be more likely to tell the truth than other witnesses if they came to trial?

A. I think they would tell the truth. I feel they should tell the truth.

Q. My question is, though, do you think they are more likely to tell the truth in a trial than other witnesses would?

A. That's a tough question to answer. That's honestly a tough question to answer. I would say they have more experience, that's all.

Q. ... I want to know if you can answer that question yes or no; do you think a police officer is more likely to tell the truth than another witness at trial?

A. I'd have to say no.

Q. Do you think that you can evaluate the testimony of a police officer the same way you would any other witness?

A. There it is again, the answer would be experience, but that's not the answer you're seeking.

Q. No, it doesn't help me that much.

A. No, if I'm selected for jury duty here I'd definitely have to be fair and impartial, I understand that.

Q. I know that's what our goal is, but do you think your past experience with all these police officers would interfere in any slight way to make you lean towards the State because they bring in police officers?

A. No, I don't think it would, no."

At the end of the voir dire examination the following occurred:

"(Prosecutor) Mr. Davis, I don't mean to pick on you, I just want to ask you a couple of questions and see exactly how you think about something you mentioned. You mentioned that you worked

with police officers for a pretty good number of years.

A. After World War II in California.

Q. And I believe during the course of your employment with EMS that you dealt with a number of police officers?

A. On a daily basis, yes sir.

Q. And as we both know, some of the witnesses in this case are going to be police officers, right?

A. Yes.

Q. Do you think that you would be able to listen to what the police officers have to say and determine in your own mind whether you think what they say makes sense or doesn't make sense and judge the credibility of their testimony the same as you would any other witness?

A. Yes.

The Court: Mr. Davis, if there is a police officer that would come in as a witness and he testifies on a particular point and another witness comes in and testifies to the contrary on the same point—do you understand the question so far?

A. Yes, sir.

The Court: And judging—making the judgment as to which you're going to believe, will you give the police officer any additional believability simply because he's a police officer?

A. No, sir ....

(Defense Counsel): Just a follow-up to that. Mr. Davis, in the situation that the Judge posed where there were two witnesses who testified about the same point—are we together?

A. (Nods head)

Q. And they have conflicting or different testimony about the same point. Now would you give the police officer any extra believability; that is, you would give him any extra point, give more weight to his testimony, however, you want to put it, because he's a police officer? Would you say, 'Well, here we are, these two people are saying different things. I'm more inclined to believe one man because he's a police officer?'

A. No, I don't believe so. I've got to be fair and impartial."

We have set out the entire relevant questioning of Davis because we must review the claim of error from the viewpoint of the entire examination and not from isolated questions. *State v. Treadway,* 558 S.W.2d 646 (Mo. banc 1977) [3, 4]; *State v. Garrett,* 627 S.W.2d 635 (Mo. banc 1982) [13, 14].

We initially note two matters which have been considered by the appellate courts in cases such as this in reviewing the trial court's action in denying a challenge for cause. There were a number of police witnesses in the case but their testimony was to be largely background in nature. The case turned upon the credibility of the eyewitness not that of the police. *See State v. Cuckovich, supra,* [11]. Secondly, the trial court here asked clarifying questions of the venireman to enable the court to exercise its discretion in assessing the qualifications of the venireman. *State v. Carter,* 544 S.W.2d 334 (Mo.App.1976) [1–4]. More importantly, however, we do not find that the examination of Davis revealed a lack of qualification as a juror.

■ A former affiliation with police work or friendship with police officers are not in themselves disqualifying factors. *State v. Petty,* 610 S.W.2d 126 (Mo.App. 1980). Davis' former position as a police officer was remote in time and brief in nature. His more recent contacts with police officers arose from his job, were professional in nature, and involved predominantly telephone contact. His police connections were far less in quantity and quality than those present in *State v. Petty, supra.* There was no requirement that Davis be stricken for those reasons.

■ In Davis' initial questioning he indicated a partiality toward the testimony of police officers. But the subsequent colloquies reflect that Davis was drawing a line between two different concepts in evaluating a police officer's testimony. He unequivocally stated that he did not believe that police were more inclined to be truthful than other witnesses simply because they were police. Such a belief would dem-

onstrate a bias making a venireman unqualified because it is based upon a presumption which is not a proper one for consideration in assessing a witness' testimony. On the other hand Davis did indicate that the experience of police officers and their day to day activities lent credence to those matters about which they testify as a result of their investigations. This attitude was not articulated with precision, possibly because the questions posed did not delineate the issue with precision, but the clear implication from Davis' answers supports that attitude. This is a proper consideration for a juror in determining whether to believe the testimony of a witness. Police officers are trained to be observant and to remember what they see. They are required to prepare accurate written reports of their investigation and observations and they know this when they make the investigation. They normally arrive at a crime scene without any emotional involvement in the crime itself and the resultant coloration which victims and participants may have. MAI–CR 2.01 specifically advises the jury that in assessing believability of a witness and the weight to be given the witness' testimony it may consider "the ability and opportunity of the witness to observe and remember any matter about which testimony is given; any interest, bias or prejudice the witness may have ..." Police officers are professional investigators and observers and we find no disqualifying bias in a venireman who recognizes that status. There was no abuse of discretion by the trial judge in refusing to strike Davis for cause.

■■■ Defendant next challenges the manslaughter instruction given by the trial court and relies upon *State v. Guyton*, 635 S.W.2d 353 (Mo.App.1982). Several answers are available to this contention. First, the matter was not preserved by specific objection at trial or in the motion for new trial. Unlike *Guyton* the jury never reached the issue of manslaughter

for it convicted of first degree murder. A manslaughter instruction was given and the jury had the opportunity to assess the possibility of an alternative to first degree murder. In that posture we cannot find plain error if there existed flaws with the instruction. Secondly, the vice which we found in *Guyton* was not present in this instruction. In *Guyton* the first degree murder and the manslaughter instruction hypothesized the same elements, notably that the killing occurred during the course of the robbery. The manslaughter instruction in *Guyton* did not therefore properly set forth the elements of that offense and constituted a positive misdirection on the offense for which defendant was convicted. The instruction here did not so misdirect. It set forth the statutory elements of manslaughter in proper form. Finally, the instruction followed precisely the mandates of MAI–CR 15.12, as modified by 2.12 dealing with aiders and abettors, as that mandate existed at the time of trial. On nearly the same date that *Guyton* was handed down the MAI–CR instructions were amended to eliminate much of the problem which we addressed in our dicta in *Guyton*.[1] We can find no error in the trial court utilizing an instruction mandated by the Supreme Court.

Defendant's final point involves the failure of the trial court to give defendant's tendered instruction on identification testimony. That contention has been fully discussed and rejected in *State v. Higgins*, 592 S.W.2d 151 (Mo. banc 1979) [19, 20]; *State v. Hurst*, 612 S.W.2d 846 (Mo.App. 1981) [38]; and *State v. Swink*, 620 S.W.2d 63 (Mo.App.1981) [2, 3]. We reject it here for the same reasons.

We have examined the points raised by defendant in his *pro se* brief and find them without merit.

Judgment affirmed.

GAERTNER, P.J., and NORWIN D. HOUSER, Special Judge, concur.

---

1. The remainder of the problem arises from the requirement of instructing down to manslaughter in all first degree murder cases whether the evidence supports such an instruction or not.

*See* MAI–CR 15.00 Supplemental Notes 3e. This problem is exacerbated in aider and abettor cases.