*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0463

DANA BRUCE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CF2-000699)

(Hon. Michael O'Keefe, Trial Judge)

(Argued June 8, 2023                    Decided November 30, 2023)

*Jeffrey L. Light* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Niki Holmes*, and *Thomas Faulkner*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL and SHANKER, *Associate Judges*, and FISHER, *Senior Judge.*

FISHER, *Senior Judge*: Appellant Dana Bruce seeks reversal of his convictions for possession of an unregistered firearm ("UF"), unlawful possession of a firearm by a convicted felon (felon in possession or FIP), unlawful possession of ammunition ("UA"), possession of a large capacity ammunition feeding device, and

attempted possession of cocaine with intent to distribute ("PWID").[1]  Appellant raises a variety of issues, but only his challenge to his conviction for possession of a large capacity ammunition feeding device entitles him to relief.  For the following reasons we affirm in part and reverse in part.

## I.    Background

On January 14, 2020, at about 8:26 a.m., Metropolitan Police Department ("MPD") officers executed a search warrant at 4928 Nash Street, NE, Apt. 1.  When officers entered the building, a resident, Maurice Cary,[2] opened the apartment door and held it ajar.  After entering the apartment, officers saw appellant walking out of the galley kitchen on the opposite side of the living room from the front door.  Officers handcuffed appellant and conducted a protective pat-down.  They found a key ring in appellant's pocket with keys to the apartment and to appellant's car, which was parked outside.

Once appellant and Cary were secured, officers searched the apartment.  In the kitchen, officers found a stand with exposed shelving.  There, officers saw—in

---

[1] No chemist would testify, and the government announced before trial began that it would proceed on the lesser-included offense of attempted possession with intent to distribute cocaine.

[2] At trial, defense counsel referred to Cary as appellant's uncle, but there is no evidence in the record that they are related.

plain view—a nine-millimeter semiautomatic pistol propped up against other items with its barrel pointed down. The gun was loaded with a full 12-round magazine.

The gun and magazine were swabbed for DNA and the swabs were sent to a forensic lab for analysis. The lab interpreted the DNA profile as a "mixture of three individuals, with at least one male contributor." The lab compared the mixture profile to DNA samples obtained from appellant and Cary and determined that it was "approximately 58.1 septillion times more likely [that] the DNA originated from [appellant] and two unknown, unrelated individuals than if the DNA originated from three unknown, unrelated individuals." The lab also determined that it was "approximately 540 times more likely [that] the DNA originated from Maurice Cary and two unknown, unrelated individuals than if the DNA originated from three unknown, unrelated individuals." As for the magazine, the DNA results were "insufficient for comparisons" and "no further conclusions [could] be made." At trial, the parties stipulated that, as of January 14, 2020, appellant had previously been convicted of an offense punishable by imprisonment for a term exceeding one year and he knew on that date that the prior conviction was so punishable. Officer Milton Agurs, who worked in MPD's firearms registration unit, testified that appellant did not have any firearms registered to him in the District on January 14, 2020.

Next to the kitchen was a table with a security camera pointed at it. According to an MPD drug expert, Investigator Ryan Bernier, security cameras can be used to

"mak[e] sure that transactions . . . and the things that are occurring on the table can be monitored and verified for accuracy." Appellant's shoes were found under the table during the search. On the table, officers found suspected powder cocaine and crack cocaine, baking soda, two digital scales, a money pouch, plastic sandwich bags, a microwave, and two Pyrex containers. Investigator Bernier explained that powder cocaine, when combined with water and baking soda, can be boiled at a high temperature in Pyrex containers to create crack cocaine. He also testified that the amount of cocaine was inconsistent with possession for personal use and had an estimated street value of $4,400.

Officers also found appellant's jacket hung up next to the kitchen. Inside appellant's jacket, officers found $5,126 in various denominations. When officers searched appellant's car, they found four loose bullets and $8,974. Collectively, the cash recovered included 169 $10 bills, 484 $20 bills, and some $5 bills.

Investigator Bernier testified that these denominations were indicative of narcotics sales because bags of crack cocaine are typically sold on the street in $10 and $20 sizes. Additionally, he explained that it was common for drug dealers to keep guns and other weapons to protect their operations. In defense, appellant's ex-girlfriend—Chaquane Bryant—testified that she and appellant sold two cars in December 2019 for $5,800 and $7,800 (after fees) and were paid with checks. During Bryant's testimony, she identified purchase agreements for both vehicles.

Bryant claimed that, after the sales, she cashed the checks and gave the money to appellant because they wanted to buy another vehicle with the proceeds.

## II.    Discussion

Appellant raises three categories of claims.  First, appellant contends that the trial court committed reversible error by striking a potential juror for cause.  Second, appellant argues that there was insufficient evidence to sustain his convictions.  Last, appellant argues that the trial court provided erroneous responses to the jury's questions and that defense counsel rendered ineffective assistance by failing to challenge the court's responses.  We address the three categories of claims in that order.

## A.    Striking a Juror for Cause

Appellant argues that the trial court committed reversible error by disqualifying a potential juror because it (1) applied a blanket rule instead of exercising its discretion after evaluating the circumstances presented and (2) applied a standard that was substantively incorrect as a matter of law.  We disagree.

"The trial court has 'broad discretion over . . . decisions to strike a juror for cause.'"  *Mason v. United States*, 170 A.3d 182, 185 (D.C. 2017) (omission in original) (quoting *Barrows v. United States*, 15 A.3d 673, 682 (D.C. 2011)).  However, "[t]he court is allowed to dismiss a juror on the ground of inferable bias only after having received responses from the juror that permit an inference that the

juror in question would not be able to decide the matter objectively." *Id.* (alteration in original) (quoting *Doret v. United States*, 765 A.2d 47, 53 (D.C. 2000), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004)). Historically, our rule has been that the trial court's "rulings will be affirmed on appeal unless the record reveals an abuse of discretion resulting from an erroneous ruling coupled with substantial prejudice to the defendant." *Tate v. United States*, 610 A.2d 237, 239 (D.C. 1992).

### 1.      The Decision to Strike for Cause

In cases that rely heavily on police testimony, such as this one, the trial court should question prospective jurors during voir dire to determine "if they are predisposed to accord more or less credence to police officer testimony" and to "ferret out . . . possible bias within the venire panel." *Jenkins v. United States*, 541 A.2d 1269, 1275 (D.C. 1988). The trial court also has a "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *see also Barrows*, 15 A.3d at 683 (noting the same obligation and holding that the trial court did not plainly err when it excused prospective jurors for cause because their responses "reasonably could have been perceived as exhibiting actual bias").

During jury selection, the trial court informed the members of the venire that it later would instruct "that the jury should not give either greater or lesser weight to

the testimony of a witness just because the witness is a police officer." It then asked the potential jurors: "[D]o any of you have such strong feelings about the police, either positive or negative, that you would have difficulty following that instruction?" In other words, the court inquired, would their feelings make it difficult for them to be fair and impartial?

Juror 16, a lawyer, was among those who answered "yes" to this question, thus acknowledging that she had "strong feelings" that would make it difficult for her to follow the instruction. During follow-up questioning, the trial court asked Juror 16 whether she would give police testimony "more or less weight." Initially, Juror 16 said that she "would probably give it less weight, just given some . . . biases in terms of law enforcement." When the trial court asked whether she "would already start to discredit" police testimony "without hearing what they would have to say," Juror 16 said: "No. No. I checked, yes, out of an abundance of caution." She elaborated, "I think generally I, you know, in studying law too I was more in terms of like defendant's side. But, yeah, I think just, I would have I guess a little bit more skepticism in terms of the veracity of their statements." Defense counsel asked Juror 16 if she "could listen to the facts and decide the facts as they are without [her] beliefs about things interfering." Juror 16 responded: "I believe so. Again, I checked yes out of an abundance of caution."

After discussing her responses with counsel, the trial court struck the prospective juror for cause. The court questioned whether Juror 16 would be able to follow the instruction to fairly consider police officer testimony the "same as the testimony of any other witness." The prosecutor noted that Juror 16 said she would approach an officer's testimony with "a little bit more skepticism," and the court responded, "[S]he did say that and she didn't take it back. She said she would be skeptical." The court posed a counter example about a juror who "came in here and said . . . generally, I guess, my disposition would be towards believing an officer . . . unless they prove otherwise." Juror 16 was "automatically[] saying she is skeptical of officers . . . . So either way it goes if somebody is leaning one way or the other, they have got to be struck as far as I am concerned."

The trial court did not abuse its discretion. We begin with the premise that "a defendant generally 'has no right to have any particular person sit on the jury.'" *Hinton v. United States*, 979 A.2d 663, 688-89 (D.C. 2009) (en banc) (quoting *State v. Sanders*, 750 N.E.2d 90, 104 (Ohio 2001)). And "[o]rdinarily, the erroneous excusal of a prospective juror for cause can have no adverse effect on the impartiality of the chosen jury or the defendant's rights, for it 'cannot cause the seating of a biased juror.'" *Id.* at 688 (quoting *Sanders*, 750 N.E.2d at 104)).

As we said in *Hinton*, "[t]here are exceptions to this generalization. For example, where venire members are targeted for exclusion based on their views, it

may unacceptably skew the jury in favor of one side." *Id.* at 688 n.112. But this exception is not as sweeping as appellant assumes. The illustrative example we gave was that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)). We added that excluding prospective jurors "on the basis of constitutionally impermissible criteria, such as race, ethnicity or gender . . . may taint the jury." *Id.*

Contrary to appellant's first contention, the record shows that the trial court did not apply a uniform rule without exercising discretion. Rather, the court investigated whether Juror 16 could be impartial when considering officer testimony. At oral argument before this court, appellant's counsel suggested that it "may have behooved the trial court to have gotten some more information" to determine Juror 16's impartiality. But appellant's trial counsel did not ask for further inquiry. Certainly, "[t]he purpose of voir dire is to expose juror bias that might affect the verdict," *Tate*, 610 A.2d at 239, but "[h]ow such biases will be uncovered during *voir dire* is left to the trial court's broad discretion." *Boertje v. United States*, 569 A.2d 586, 592 (D.C. 1989). Here, where the court addressed Juror 16's initial response, provided her an opportunity to clarify, and considered Juror 16's answer

to defense counsel's question, "[w]e perceive no abuse of discretion in the way the voir dire was conducted." *Tate*, 610 A.2d at 240 (rejecting the appellant's argument that the trial court abused its discretion by failing to ask a particular question).

Appellant's second argument fares no better. It is true that "[o]ne cannot fairly expect any juror's mind to be a *tabula rasa* with respect to the kind of issue presented here." *Medrano-Quiroz v. United States*, 705 A.2d 642, 651 (D.C. 1997). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). But Juror 16's statements and demeanor "permit[ted] an inference" that she would not have been able to weigh officer testimony impartially. *See Mason*, 170 A.3d at 185.

Although Juror 16 stated that she would not immediately discredit officer testimony and answered "I believe so" when defense counsel asked whether she could decide the facts "without her beliefs about things interfering," Juror 16 did not retract her statement that she "would probably give [officer testimony] less weight." *Cf., e.g.*, *State v. Bevly*, 665 S.W.2d 46, 50-51 (Mo. Ct. App. 1984) (holding that there was no abuse of discretion when the trial court refused to disqualify a potential juror who initially indicated partiality toward officer testimony but later "unequivocally stated that he did not believe that police were more inclined to be truthful than other witnesses simply because they were police"). During voir dire,

"the trial judge's function" is to "reach conclusions as to [the] impartiality and credibility [of potential jurors] by relying on [his or her] own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez*, 451 U.S. at 188. As "an appellate court[, we cannot] easily second-guess the conclusions of the decision-maker who heard and observed" Juror 16. *Id.* On this record, we see no reason to disturb the trial court's "determination of [Juror 16's] impartiality, in which demeanor plays such an important part." *Rease v. United States*, 403 A.2d 322, 325 (D.C. 1979) (per curiam) (quoting *Ristaino v. Ross*, 424 U.S. 589, 595 (1976)).

### 2. Appellant Has Not Carried His Burden

Purporting to rely on our nuanced decision in *Mason*, appellant asserts that he need not show prejudice because the disqualification unacceptably skewed the jury in favor of the prosecution and created reasonable concerns about the fairness of the judicial system. These assertions are at odds with the record. Three other jurors were disqualified based on their responses to the officer-testimony question—two of whom said that they were *more* likely to credit officer testimony. Conversely, the trial court did not strike Juror 19, who initially answered "yes" to the officer-testimony question because of "how some police officers are." Unlike Juror 16, Juror 19 clarified that they could remain neutral and assess the officers' credibility based on their testimony. We cannot say that excluding Juror 16 for her

views on how she would treat officer testimony "unacceptably skew[ed] the jury in favor of one side." *Hinton*, 979 A.2d at 688 n.112. Nor can we accept appellant's argument that striking this prospective juror created reasonable concerns about the fairness of the judicial system. As *Mason* itself recognized, it is appropriate to strike a potential juror for cause where the trial judge makes a finding, based on an adequate record, that she would have difficulty being impartial. 170 A.3d at 187.

Thus, we need not grapple with whether appellant's case fits within any recognized exception to the normal rule that reversal requires a showing of prejudice. As we explained in *Tate*, a trial court's decision granting a challenge for cause "will be affirmed on appeal unless the record reveals an abuse of discretion resulting from *an erroneous ruling coupled with substantial prejudice to the defendant.*" 610 A.2d at 239 (emphasis added). Because we conclude that the trial court did not exercise its discretion erroneously, appellant cannot satisfy even the first prong of that two-part standard.[3] In sum, there was no abuse of discretion here.

## B. Sufficiency of the Evidence

Appellant next argues that the government failed to prove that he had the knowledge, intent, or both, necessary to sustain a conviction on any of the counts.

---

[3] Appellant does not claim that the impaneled jury was biased against him. *See Tate*, 610 A.2d at 239. Moreover, if the trial court had not stricken Juror 16, the government could have exercised its remaining peremptory strike. It seems clear that Juror 16 would not have served on the jury even if she had not been stricken for cause.

For the reasons stated below, we hold that appellant has not carried his "heavy burden" to show that the evidence was insufficient with respect to most of his convictions. *Dorsey v. United States*, 154 A.3d 106, 112 (D.C. 2017). However, we reverse appellant's conviction for possession of a large capacity ammunition feeding device.

We review insufficiency-of-the-evidence claims de novo, *Mills v. District of Columbia*, 259 A.3d 750, 756 (D.C. 2021), but "we view the evidence in the 'light most favorable to the government, drawing all reasonable inferences in the government's favor, and giving deference to the jury's right to determine credibility and weight.'" *Dorsey*, 154 A.3d at 112 (quoting *Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015)). "An appellant making a claim of evidentiary insufficiency bears the heavy burden of showing that the prosecution offered no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Id.* (quoting *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013)). "In considering the sufficiency of the evidence, we make no distinction between direct and circumstantial evidence, and '[c]ircumstantial evidence is not intrinsically inferior to direct evidence.'" (*Christopher*) *Smith v. United States*, 809 A.2d 1216, 1222 (D.C. 2002) (alteration in original) (quoting *Bernard v. United States*, 575 A.2d 1191, 1193 (D.C. 1990)).

### 1.      Gun and Ammunition Counts

Appellant was convicted of possession of an unregistered firearm, unlawful possession of ammunition, possession of a firearm by a convicted felon, and possession of a large capacity ammunition feeding device in violation of D.C. Code §§ 7-2502.01(a), 7-2506.01(a)(3), 22-4503(a)(1), and 7-2506.01(b).  Appellant contends that the evidence was insufficient to show that he (1) intended to exercise dominion and control over the handgun, (2) knowingly possessed the ammunition, (3) possessed the handgun at a time after he had been convicted of a felony and when he knew he had been convicted of a felony, and (4) possessed a magazine that he knew had the capacity to hold more than 10 rounds.

"To support a conviction for UF, the evidence 'must show 1) that the defendant knowingly possessed a firearm; and 2) that firearm had not been registered as required by law.'" *Dorsey*, 154 A.3d at 112 (quoting *Hammond v. United States*, 77 A.3d 964, 969 (D.C. 2013)).  "In general, to support a conviction for UA, the evidence must show that the defendant possessed ammunition without having the necessary registration for a firearm." *Id.*  "To sustain a [FIP conviction], the evidence 'must show that 1) the defendant had been convicted of a felony and 2) that he owned or kept a firearm, or that he had a firearm in his possession or under his

control.'" *Id.* (quoting *Hammond*, 77 A.3d at 969).[4] On its face, the statute prohibiting possession of a large-capacity ammunition feeding device requires proof that the defendant possessed "a magazine . . . that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." D.C. Code § 7-2506.01(b).

Possession of "contraband can be proven by showing either actual or constructive possession." *Ramirez v. United States*, 49 A.3d 1246, 1249 (D.C. 2012). "Our cases have defined 'actual possession' as 'the ability of a person to *knowingly* exercise direct physical custody or control over the property in question.'" *Robinson v. United States*, 100 A.3d 95, 105 n.16 (D.C. 2014) (quoting *Johnson v. United States*, 40 A.3d 1, 14 (D.C. 2012)). "To prove constructive possession of contraband, the evidence must show that the accused (1) had knowledge of its presence and (2) 'had both the ability and the intent to exercise dominion and control over it.'" (*Tamara*) *Smith v. United States*, 55 A.3d 884, 887 (D.C. 2012) (quoting *Moore v. United States*, 927 A.2d 1040, 1050 (D.C. 2007)).

---

[4] We recently declined to decide whether *Rehaif v. United States*, 139 S. Ct. 2191 (2019), requires the government to also prove a defendant's knowledge of his prohibited status under D.C. Code § 22-4503(a)(1). *See Atkins v. United States*, 290 A.3d 474, 481 (D.C. 2023) ("Assuming without deciding the District's statute plainly requires such a showing and a corresponding instruction . . . ."). We need not decide the issue here either because the jury was instructed that the government had to prove such knowledge.

"Constructive possession may be sole or joint and may be proven by direct or circumstantial evidence." *Rivas v. United States*, 783 A.2d 125, 129 (D.C. 2001) (en banc) (citation omitted). "Where knowledge and ability to exert control over contraband are shown, 'the additional evidence necessary to prove constructive possession is comparatively minimal.'" *Moore*, 927 A.2d at 1050 (quoting *Rivas*, 783 A.2d at 129). "In particular, we have recognized that a *prima facie* case of constructive possession may be established by evidence linking the accused to 'an ongoing criminal operation of which the possession is a part.'" *Id.* (quoting *Earle v. United States*, 612 A.2d 1258, 1265-66 (D.C. 1992)). "Evidence suggesting that a defendant has regular access to the premises, such as possession of a key, may also be sufficient to establish constructive possession." *Id.* (quoting *United States v. Dingle*, 114 F.3d 307, 311 (D.C. Cir. 1997)). Likewise, "[e]vidence showing [a] defendant's 'connection with [contraband]' or 'evasive conduct . . . coupled with proximity may suffice' to establish constructive possession." *Dorsey*, 154 A.3d at 112 (omission in original) (quoting *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003)).

### i.    Possession of an Unregistered Firearm

The record shows that appellant had not registered the firearm in the District of Columbia. Additionally, no one disputes that the jury could have permissibly found that appellant had the ability to exercise dominion and control over the

handgun. "The question before us is whether the jury rationally could find beyond a reasonable doubt that [appellant] *intended* to exercise that power . . . ." *Rivas*, 783 A.2d at 130. We answer that question in the affirmative.

Appellant devotes much of his argument about possession of the firearm and ammunition to a perceived lack of evidence linking him to an ongoing drug operation. That argument is unpersuasive for two reasons. First, as discussed below, the evidence supporting the attempted PWID count was compelling and strongly supports the jury's verdict on the gun counts. Second, evidence linking a defendant to an ongoing drug operation is but one way to prove constructive possession of a weapon. On this point, we find the parallels to *Dorsey* highly persuasive.

In *Dorsey*, we upheld UF, UA, and FIP convictions based on similar evidence. 154 A.3d at 110. There, officers approached an apartment to execute a search warrant but were spotted by the defendant and other occupants on the balcony. *Id.* at 110-11. When officers entered the apartment, they saw the defendant exiting the kitchen area. *Id.* at 111. During the search, officers found a revolver on a shelf inside a kitchen cabinet. *Id.* DNA testing later revealed a partial DNA profile. *Id.* At trial, a DNA analyst testified that the "probability of randomly selecting another individual unrelated to [the defendant] with the same partial DNA profile as the one recovered from the gun was one in 290 billion in the U.S. Caucasian population, one

in eleven billion in the U.S. African-American population, and one in 52 billion in the U.S. Hispanic population." *Id.*

We reasoned that a number of factors supported the jury's finding that the defendant "knew of the gun's location and had the ability and intent to exercise dominion and control over the gun before the officers burst into the apartment." *Id.* at 113. First, we noted that, although four people were at the apartment and "there was no evidence that [he] resided in the apartment," the defendant "was the only one seen exiting and in close proximity to the kitchen where the gun was found." *Id.* at 112. Second, one officer testified that the defendant "immediately left the balcony when he saw the police officers approaching." *Id.* The officer's testimony permitted the jury to infer that "this was evasive conduct by [the defendant] consistent with a consciousness that he needed to ensure that any contraband was off his person or hidden." *Id.* Third, the sketch of the apartment showed that there was only one way in or out of the kitchen, from which the jury could infer that the defendant purposefully went into the kitchen. *Id.* at 112-13. Last, we noted the strong DNA evidence linking the defendant to the gun. *Id.* at 113.

Here, drawing all reasonable inferences in the government's favor, a jury could have reasonably inferred that appellant stashed the gun on the kitchen shelf to distance himself from it. First, like the defendant in *Dorsey*, appellant was the only one seen exiting the kitchen when officers arrived. And appellant's connection to

the premises is even stronger because he had a key to the apartment. Second, the awkward position of the gun—resting on its barrel with its handgrip toward the kitchen entrance—and Investigator Bernier's testimony that this was "not a very secure spot for a firearm"—would allow the jury reasonably to infer that appellant hastily stashed the gun. Third, just like *Dorsey*, the sketch of the apartment shows there was only one way in or out of the kitchen. Last, there was strong DNA evidence linking appellant to the gun. When evidence of the ongoing drug operation is added to the mix, this was a very strong case.[5]

### ii.     Unlawful Possession of Ammunition

As for the UA count, there was sufficient circumstantial evidence that appellant knew the gun was loaded. MPD found $4,400 worth of cocaine in the apartment and $5,126 in cash in appellant's coat near the drug-packaging table. Investigator Bernier testified that drug dealers often keep weapons—including firearms—to protect themselves and their product from robbers. For these purposes, a loaded firearm obviously would be more useful than an empty one. It was reasonable for the jury to infer that appellant knew the gun was loaded and that

---

[5] Because there was ample evidence to prove beyond a reasonable doubt that appellant constructively possessed the pistol, we need not discuss the sufficiency of proof that he actually possessed it. However, we emphasize that a conviction for actual possession does not require that the contraband be found on the defendant's person when the police confront him. *See, e.g.*, *Hooks v. United States*, 191 A.3d 1141, 1144 (D.C. 2018); (*Christopher*) *Smith*, 809 A.2d at 1222.

appellant intended the gun to be loaded to protect the drugs and money. That is especially true given that officers found four additional bullets, albeit of a different caliber, in the trunk of appellant's car. *Cf. Evans v. United States*, 122 A.3d 876, 891 (D.C. 2015) ("[T]he inference of constructive possession as to each gun is to a degree supported by the presence of the other."). "There being sufficient evidence of possession of the [loaded] gun, it follows that the conviction of possession of ammunition must also be sustained." *Reid v. United States*, 466 A.2d 433, 435 (D.C. 1983) (citation omitted).

### iii.    Felon in Possession

The parties stipulated that appellant had a prior felony conviction that precluded him from possessing a firearm and that appellant knew of that status as of January 14, 2020, the day of the search. Given the wording of this stipulation, appellant contends that it would not have been enough to convict him if the government established that he possessed the firearm earlier than January 14, 2020. He further argues that the DNA evidence and expert testimony presented by the government did not establish that appellant possessed the gun on January 14, 2020. We disagree. As the government points out, it did not present evidence of appellant's actions on any other date. And, as explained above, there was sufficient circumstantial evidence for the jury reasonably to infer that appellant possessed the gun on January 14, 2020, when the search occurred.

### iv.     Large Capacity Ammunition Feeding Device

Having established that there was ample evidence to convict appellant on the UF, UA, and FIP counts, we consider whether the government was required to prove that appellant knew the magazine was capable of holding more than ten rounds.[6] We hold that the government was required to do so.

D.C. Code § 7-2506.01(b) provides that "[n]o person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm." The statute defines "large capacity ammunition feeding device" to include "a magazine . . . that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." D.C. Code § 7-2506.01(b). In this case, the magazine was seated within the grip of the pistol and did not extend below it; in other words, the magazine was mostly out of sight. The parties agree that the statute is silent on whether the government is required to prove a defendant's mens rea with respect to the capacity of a magazine.

Normally, the plain language and ordinary meaning of a statute control. *See Sharps v. United States*, 246 A.3d 1141, 1149 (D.C. 2021). However, in

---

[6] Appellant makes clear that he is raising only the issue of mens rea, a question of statutory construction. He does not claim that legislatures are prohibited from banning ammunition feeding devices capable of holding more than ten rounds.

criminal law, courts "construe [a] statute in light of the background rules of the common law, in which the requirement of some mens rea for a crime is firmly embedded." *Staples v. United States*, 511 U.S. 600, 605 (1994) (italics and internal citations omitted); *see Carrell v. United States*, 165 A.3d 314, 321 (D.C. 2017) (en banc) (there are gradations of mens rea, "[b]ut generally, courts should infer that the government must prove at least that a defendant 'knows the facts that make his conduct fit the definition of the offense'" (quoting *Elonis v. United States*, 575 U.S. 723, 735 (2015) (brackets omitted))). That background presumption can be overcome after weighing several considerations,

> beyond mere statutory silence, which bear upon legislative intent to impose strict liability, including: (1) the contextual rules of the common law; (2) whether the crime can be characterized as a "public welfare offense" created by the legislature; (3) the extent to which a strict liability reading of the statute would seemingly encompass entirely innocent conduct; and (4) the harshness of the penalty.

*McNeely v. United States*, 874 A.2d 371, 389 (D.C. 2005) (footnote omitted); *see also Staples*, 511 U.S. at 605-18.

We have not previously construed § 7-2506.01(b), but in *Moore* we addressed the mens rea question with respect to a similarly worded statute and on facts not meaningfully distinguishable from those presented here. 927 A.2d at 1054. In *Moore*, the appellants challenged their convictions for possession of a prohibited weapon—a Beretta semiautomatic handgun with a 15-round magazine—in violation

of former D.C. Code § 22-3214(a) (1981). *Id.* That statute, which has been recodified at § 22-4514(a), stated that "[n]o person shall within the District of Columbia possess any machine gun" or other enumerated weapon. *Id.* (alteration in original). At the time, a machine gun was defined under local law as "'any firearm which shoots automatically or semiautomatically more than 12 shots without reloading.'" *Id.* (quoting former D.C. Code § 22-3201(c)). Thus, the capacity of the magazine made the semiautomatic Beretta a machine gun.

Invoking *Staples*, appellant Moore argued that to convict him, the government had to prove "that he knew the Beretta could be fired more than twelve times without reloading." *Id*. Relying heavily on *In re D.S.*, 747 A.2d 1182 (D.C. 2000), where the appellant had also invoked *Staples*, we concluded that the statutory scheme obligated "a person to make sure the weapon [was] not of the prohibited variety" and held "that the government was not required to prove that [the] appellants knew the firing capabilities of the Beretta handgun." *Moore*, 927 A.2d at 1055.

*Moore*'s holding is debatable because whether the firearm was a machine gun depended on the magazine's capacity—a characteristic that is not always readily visible. Yet, this court was well aware of this complication. Previously, the Supreme Court in *Staples* had required the government to prove that the defendant knew that a hidden modification had converted an AR-15 semiautomatic rifle into a fully automatic weapon, that is, a machine gun as defined by federal law. *See* 511

U.S. at 615, 619.  And the reason proof of knowledge was not required in *In re D.S.* was because the barrel length of the sawed-off shotgun was "visible to anyone looking at the weapon."  747 A.2d at 1186.

However, the visibility distinction did not prevent the panel in *Moore* from holding that the government was not required to prove the appellants' knowledge of the magazine's capacity.  *See* 927 A.2d at 1055 n.17 (discussing *In re D.S.* and stating that "we do not take our comments about the obviousness of barrel length to mean that the government has the burden of proving knowledge of critical characteristics if they are not plainly visible").  Instead, crucial to the outcome in *Moore* was the legislative judgment "that certain weapons . . . are 'so highly suspect and devoid of lawful use that their mere possession is forbidden.'"  *Id.* at 1054-55 (quoting *United States v. Brooks*, 330 A.2d 245, 247 (D.C. 1974)).  The government must prove knowing and intentional possession of the weapon, we held, but, "in effect, the law obligates such a person to make sure the weapon is not of the prohibited variety."  *Id*. at 1055.[7]

---

[7] In *Moore*, we took care not to "foreclose affirmative defenses based on excusable ignorance of such characteristics."  927 A.2d at 1055 n.17.  Because "no such defense was advanced" in that case, "we [left] the discussion of possible affirmative defenses for another day."  *Id.*  Notably, the petitioner in *Staples* had "testified that the rifle had never fired automatically when it was in his possession." 511 U.S. at 603.

We cannot simply ignore *Moore*'s interpretation of the prohibited weapon statute when § 7-2506.01(b) is worded similarly ("No person in the District shall possess . . . .") and was intended to fill the gap created when the term "machine gun" was redefined to focus on the firing action of the weapon (automatic vs. semiautomatic) rather than its capacity. Enacted after our decision in *Moore* and the Supreme Court's decision in *Staples*, the statute at issue here does not contain any explicit requirement of proof that the defendant knew the capacity of the magazine. We thus must decide whether we are obliged to follow the reasoning of *Moore*. For a number of reasons, we conclude that *Moore* does not govern our decision in this case.

One important point is that the statute before us today, § 7-2506.1(b), is not the same statute we addressed in *Moore*, § 22-3214(a). Accordingly, we are not, strictly speaking, constrained by *M.A.P. v. Ryan*. *See* 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court[;] . . . such [a] result can only be accomplished by this court en banc."). Although we generally derive similar meaning from similar language,[8] this is not an inexorable command. *Cf. Bacon v. Texas*, 163 U.S. 207, 226 (1896) ("[A] court is under no obligation to

---

[8] *See United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring) (noting that the presumption of consistent usage applies not only within the same statute, but also when the legislature "uses the same language in two statutes having similar purposes").

put the same construction upon a later statute that it has placed upon an earlier one, though the language of the two may be similar.").

Furthermore, the Supreme Court emphasized in *Staples* that its "holding [wa]s a narrow one." 511 U.S. at 619. The Court did not attempt "to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." *Id.* at 620 (quoting *Morissette v. United States*, 342 U.S. 246, 260 (1952)). Nor did it require a clear statement of legislative intent in order to dispense with a mens rea requirement. *Id.* at 618.

This court was well aware of *Staples* when it decided *Moore*, but we did not treat the Supreme Court's decision as decisive. *See* 927 A.2d at 1054 (noting that in *In re D.S.* we had rejected the argument that appellant Moore was making based on *Staples*). The Supreme Court was construing a federal statute in *Staples*, not a District of Columbia statute. *Id.* By contrast, *In re D.S.* construed the same statute at issue in *Moore*. *Id*. We rested our decision in *Moore* "[o]n the authority of *D.S.*" *See id.* at 1055.

Finally, there have been significant developments in this area of the law since *Moore* was decided. Following the Supreme Court's lead, this court, sitting en banc, has made clear that "'[t]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent

conduct.'" *Perez Hernandez v. United States*, 286 A.3d 990, 1001 (D.C. 2022) (en banc) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *see also Carrell*, 165 A.3d at 321. Even if we are permitted to adopt different rules of statutory construction than the Supreme Court follows when interpreting other statutes, we clearly are obliged to follow our own en banc decisions.

In *Carrell* we held that the lack of an explicit mens rea element in the District's two threats statutes did not render them strict liability offenses. 165 A.3d at 319. As part of that holding, we announced a rule of construction that District of Columbia courts must apply to criminal statutes. "[W]e require a clear statement from the legislature before we will conclude that a defendant may be found guilty of a crime without regard to his subjective state of mind." *Id.* at 320. Whereas *Staples* declined to adopt a bright line test for interpreting criminal statutes, *Carrell* endorsed a definitive rule of construction that we are required to follow.

Neither the plain language of § 7-2506.1(b), nor its legislative history, contains a clear statement that would satisfy *Carrell*. As shown above, the text does not specify a mental state that the government must prove. The legislative history explains that the purpose of the bill was "to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload." Firearms Registration Amendment Act of 2008, D.C. Council, Report on Bill 17-843 at 2 (Nov. 25, 2008). The committee recognized that "magazines holding[] over 10

rounds are more about firepower than self-defense" and "agree[d] with the Chief of Police that the 2 or 3 second pause to reload can be of critical benefit to law enforcement." *Id.* at 9. It recommended the ban on extended clips to "limit[] fire power" and because of its "desir[e] to advantage the police, especially given homeland security issues in the District." *Id.*

The committee reports surely demonstrate that the Council appreciated the increased danger that firearms with extended magazines posed to the public and to law enforcement officers. However, nothing within these reports declares a legislative intent to hold a defendant criminally liable even if he does not know the facts which make his conduct illegal. Finding no clear statement in either the statute or its legislative history to overcome the presumption in favor of a scienter requirement for this element, we hold that the government was required to prove that appellant Bruce knew that the magazine could hold more than 10 rounds of ammunition in order to convict him under § 7-2506.1(b). Because the government failed to do so, we reverse appellant Bruce's conviction of this charge.

### 2. Attempted Possession with Intent to Distribute

Appellant was also convicted of attempted PWID in violation of D.C. Code § 48-904.01(a)(1). He argues that the lack of direct evidence connecting him to the drugs and drug paraphernalia and his explanation for the large sums of cash were

enough to show that the government failed to prove this count beyond a reasonable doubt. We reject both arguments.

To prove attempted PWID, "[t]he government must establish conduct by the defendant that is reasonably adapted to the accomplishment of the crime of possession of the proscribed substance, and the requisite criminal intent." *Seeney v. United States*, 563 A.2d 1081, 1083 (D.C. 1989). "That is, '[t]here must be some action, some word, or some conduct that links the [defendant] to the narcotics and indicates that he had some stake in them, some power over them.'" *James v. United States*, 39 A.3d 1262, 1269 (D.C. 2012) (alterations in original) (quoting *Rivas*, 783 A.2d at 128).

Just as there was strong evidence to convict appellant of possessing the gun and ammunition, there was also abundant evidence to convict him of attempted PWID. As even appellant describes it, officers found him next to the table that "generates the vision of a criminal chemist at work." *Pannell v. United States*, 136 A.3d 54, 59 (D.C. 2016). Appellant's shoes were off and under the table, and he had a key to the apartment. To be sure, the "inference that a person who occupies an apartment has dominion and control over its contents" is not as strong when, as here, that "person shares the premises with others." *See Moore*, 927 A.2d at 1050 (quoting *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005)). But the government's other evidence firmly links appellant to an ongoing criminal venture

involving the suspected drugs. *See id.*; *cf. Pannell*, 136 A.3d at 59 ("[W]hat's missing is evidence that appellant participated in that venture.").

For example, appellant had nearly $15,000 in mostly small denomination bills in his coat pocket and the trunk of his car. "As we know beyond peradventure, drug trafficking and large sums of cash go together." *United States v. Farrell*, 921 F.3d 116, 137 n.24 (4th Cir. 2019). Moreover, Investigator Bernier testified that the small denominations of cash and the presence of the firearm were indicative of a drug-dealing operation, observations that we have shared. *See Dugger v. United States*, 295 A.3d 1102, 1115 (D.C. 2023); *Peay v. United States*, 597 A.2d 1318, 1321 (D.C. 1991) (en banc).

Appellant suggests that his home improvement business and Bryant's testimony that they sold their cars in December 2019 so appellant could purchase a new vehicle explain the cash. He also faults the government for failing to disprove these possible sources of this cash. But "[t]he well settled law is that the government is not required to negate every possible inference of innocence before an accused can be found guilty of an offense beyond a reasonable doubt." *In re T. J. W.*, 294 A.2d 174, 176 (D.C. 1972). "It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Green v. United States*, 164 A.3d 86, 91 (D.C. 2017) (quoting *Vest v. United States*, 905 A.2d 263, 266 (D.C. 2006)).

Although Bryant's testimony might have suggested a source for the funds, appellant's decisions to convert the checks into cash and to retain the cash—coupled with his new car parked outside—raise a reasonable inference that either appellant lied to Bryant about needing the cash to buy a new car or that Bryant was not testifying truthfully. The jury was also free to consider that Bryant's testimony did not explain why appellant needed hundreds of small-denomination bills; why he would carry around a large sum of cash despite the risk of theft; and why he had $5,126 in his coat near the table with all of the materials necessary for cooking and packaging crack cocaine. Bryant's bare reference to appellant's home improvement business, without more, likewise does not explain the cash. Ultimately, the government's evidence proved that appellant's conduct was "reasonably adapted to the accomplishment of the crime of possession of" cocaine, *Seeney*, 563 A.2d at 1083, and that he had the "specific intent to distribute" it. *Holt v. United States*, 805 A.2d 949, 957 (D.C. 2002).

### C.    Responses to Jury Questions

Finally, appellant contends that the trial court erred in its responses to the jury's questions about the large capacity ammunition feeding device and FIP counts. Alternatively, appellant argues that reversal is required because defense counsel was ineffective in failing to challenge the trial court's responses to these questions. As we have already reversed appellant's conviction for possessing the ammunition

feeding device, we need not address the jury note related to this count. For the reasons that follow, we are not persuaded by his argument with respect to the FIP conviction.

"While we review the trial court's decision on what, if any, response to give to a jury's question for abuse of discretion[,] the accuracy of the instruction itself is a legal question that we review de novo." *Lucas v. United States*, 240 A.3d 328, 343 (D.C. 2020). "When a party fails to raise a timely objection to an instruction" or to the court's response to a jury question, the claimed error is not preserved, and "we will review that claim of error under the plain error standard." *Buskey v. United States*, 148 A.3d 1193, 1204 (D.C. 2016) (quoting *Mobley v. United States*, 101 A.3d 406, 422 (D.C. 2014)). "Courts are especially reluctant to reverse for plain error when it is invited." *Cowan v. United States*, 629 A.2d 496, 503 (D.C. 1993) (internal quotation marks omitted). That said, even under plain error review the result would be the same. Even assuming that appellant could identify error that is plain or obvious, he cannot satisfy the third prong of the plain error test.[9]

---

[9] "'Under the test for plain error, an appellant must show (1) error, (2) that is plain, and (3) that affected [his] substantial rights.'" *Buskey*, 148 A.3d at 1204. (alteration in original) (quoting *Fortune v. United States*, 59 A.3d 949, 954 (D.C. 2013)). "'To show that the error affected a substantial right, the appellant . . . must show a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *Id.* (alteration and omission in original) (quoting *Fortune*, 59 A.3d at 954). "'Even if all three of these conditions are met, this court will not reverse unless (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Fortune*, 59 A.3d at 954).

The jury sent a note during deliberations that asked: "Is it possession of [a] firearm at the time of search and arrest? Or possession at any time previous to search?" After some discussion, defense counsel stated: "[I]n this situation, the government's proof and charge is on or about January 14, 2020. And I don't think that the . . . answer should be . . . anytime. . . . And I don't think it can be January 11th or January 12th; it's January 14th." However, defense counsel then changed course and proposed what the court should say, explaining, "this is straight out of *Ingram*[10:]"

> When an indictment charges that the offense occurred on or about a certain date – as it did here – a defendant is . . . on notice that the date is not critical, the evidence will conform to the indictment. . . .
>
> In such circumstance if . . . it established that the offense was committed on a date reasonably close to the one alleged.

The trial court agreed that "something along those lines" would be an appropriate response. The trial court also reconsidered its earlier proposal to remind the jurors to reread the possession instruction because it did not seem "like they ha[d] an issue with possession." Defense counsel agreed.

Based on defense counsel's suggestion, the trial court proposed the following response:

---

[10] *See Ingram v. United States*, 592 A.2d 992, 1007 (D.C. 1991).

The indictment charges that the offense of unlawful possession of a firearm was committed on or about January 14, 2020, and the proof need not establish with certitude the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the alleged date.

Defense counsel agreed that the instruction was proper. Nevertheless, appellant now argues that the trial court's response "misled the jury into thinking that it could convict [him] based on possession of a gun 'on a date reasonably near the alleged date' even though the record evidence would not support such a conclusion." He emphasizes that "the only evidence in the record as to when Mr. Bruce had been convicted of a felony and knew he had been convicted of a felony consisted of the parties' stipulation," which specified January 14, 2020.

Contrary to appellant's argument, it is difficult to believe that any rational juror could have found that appellant possessed the gun but not on January 14, since the government did not present evidence of appellant's actions before that date. Given the government's argument at trial, it is far more likely the jury was seeking confirmation that appellant could be convicted of the FIP count for possessing the gun shortly before officers discovered it on the shelf.

Moreover, on plain-error review, we "may consider the *entire* record—not just the record from the *particular proceeding* where the error occurred." *Greer v. United States*, 141 S. Ct. 2090, 2098 (2021). That includes the information

contained in a presentence report. *Id.* Appellant's presentence report lists prior felony convictions, including a 2004 conviction for carrying a pistol without a license. Appellant cannot plausibly claim that he was substantially prejudiced by the court's response allowing the jury to consider "a date reasonably near" January 14, 2020, when his first felony conviction occurred more than a decade prior. This lack of substantial prejudice also forecloses appellant's claim of ineffective assistance of counsel. *See Taylor v. United States*, 603 A.2d 451, 461 (D.C. 1992). This is so because "[t]he standard for prejudice under *Strickland* is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis." *Becht v. United States*, 403 F.3d 541, 549 (8th Cir. 2005). Both analyses require a defendant to establish "a reasonable probability" of a different result. *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004); *Taylor*, 603 A.2d at 461. And here, appellant has not made that showing.

## III. Conclusion

For the foregoing reasons, we affirm appellant's convictions for possession of an unregistered firearm, unlawful possession of a firearm by a convicted felon, unlawful possession of ammunition, and attempted possession of cocaine with intent to distribute. We reverse appellant's conviction for possession of a large capacity ammunition feeding device.

*So ordered.*